FILED

12/27/2019

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 16, 2019

## COURTNEY B. MATHEWS v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Montgomery County
No. 63CC1-2015-CR-343    Don R. Ash, Senior Judge**

_____

## No. M2017-01802-CCA-R3-PC

_____

The Petitioner, Courtney B. Mathews, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury convictions for four counts of first-degree felony murder and one count of especially aggravated robbery. On appeal, the Petitioner's issues center around (1) an ex parte communication between the trial judge and trial counsel that took place at the trial judge's residence; (2) trial counsels' inadvertent disclosure of the unredacted timeline to the co-defendant's defense team that contained attorney-client privileged information; (3) the lack of any jury instructions on lesser-included offenses for the felony murder counts; (4) the Petitioner's alleged absence during the issuance of the supplemental jury instruction on criminal responsibility and when the trial judge answered jury questions; and (5) cumulative error. After a thorough review of the record, we reverse the judgment of the post-conviction court. We conclude that due to trial counsels' various deficiencies, there has been a complete breakdown in the adversarial process during the Petitioner's motion for new trial proceedings. While the Petitioner's convictions remain intact, the case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Reversed; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Courtney B. Mathews (on appeal), Pro Se, Clifton, Tennessee; and Luke A. Evans and Rose Parker (at post-conviction hearing), Murfreesboro, Tennessee, for the appellant, Courtney B. Mathews.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Arthur F. Bieber, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION
## FACTUAL BACKGROUND

In June 1996, a Montgomery County jury convicted the Petitioner of four counts first-degree felony murder and one count of especially aggravated robbery. The Petitioner's convictions stem from the 1994 robbery of a Clarksville Taco Bell and the slaying of four of its employees. See State v. Courtney B. Matthews,[1] No. M2005-00843-CCA-R3-CD, 2008 WL 2662450, at *1 (Tenn. Crim. App. July 8, 2008), perm. app. denied (Tenn. Apr. 10, 2015). The evidence at trial established that in the early morning hours of January 30, 1994, four employees were executed during a robbery of the restaurant. Each of the four victims suffered multiple gunshot wounds. Officers also discovered that a safe in the business office of the restaurant had been blown open by a shotgun blast and emptied of nearly $3,000 in cash and coins. The State sought the death penalty, but the jury imposed a sentence of life in prison without the possibility of parole for each felony murder conviction. The trial court sentenced the Petitioner to twenty-five years for the especially aggravated robbery conviction and ordered that all sentences be served consecutively. Judgments were filed on August 15, 1996.

In addition, David Housler, the co-defendant, was tried separately for the murders, and his trial was held in November 1997. See State v. Housler, 193 S.W.3d 476 (Tenn. 2006). He was not tried for especially aggravated robbery. The State's strategy at the co-defendant's trial

> was (1) to establish [the Petitioner's] guilt in committing the Taco Bell robbery and murders by using many of the same witnesses and much of the same evidence that the prosecution used at [the Petitioner's] trial and (2) to establish [the co-defendant's] guilt in the same crimes by using his written statement, which placed him with [the Petitioner] as a lookout on the night of the killings, and with the testimony of several corroborating witnesses.

Id. at 484. Following the conclusion of the evidence, the jury found the co-defendant guilty of four counts of felony murder and imposed a punishment of life imprisonment. The trial court ordered that those life sentences be served consecutively to one another.[2]

The Petitioner's case languished in the trial court for over nine years before the motion for new trial was adjudicated in March 2005. Accordingly, we feel a review of

---

[1] This court on direct appeal believed that the Petitioner's surname was spelled "Mathews" but, consistent with custom, used the spelling of "Matthews" as set forth in the charging instrument.

[2] The co-defendant was ultimately granted post-conviction relief from his convictions. See David G. Housler, Jr. v. State, No. M2010-02183-CCA-R3-PC, 2013 WL 5232344 (Tenn. Crim. App. Sept. 17, 2013).

the procedural history post-trial is in order. On September 12, 1996, the Petitioner's motion for new trial, in which he alleged seventeen grounds for relief, was filed. The issues were bare allegations contained in one sentence, without argument, and without citation to any legal authority. Filed contemporaneously with the motion for new trial were motions to stay the proceedings until a trial transcript could be prepared and for leave to allow amendments to the motion for new trial after preparation of the transcript. The trial court ordered that "a complete transcript of all pretrial, jury selection and trial proceedings be prepared" and granted the Petitioner's motion for leave to amend. A hearing was originally scheduled on October 17, 1996, but the trial court's docket on that day showed that the motion was "stri[c]ken." A notation in the trial court's docket next to the October 17, 1996 entry, states, "ordered transcript 11-6-03."

In October 2000, associate counsel[3] filed a motion to withdraw, wherein he noted that the Administrative Office of the Courts ("AOC") would no longer pay for two attorneys to represent the Petitioner because it was "no longer a capital case," before stating that lead counsel had "returned to the United States" and could represent the Petitioner's "interests regarding the pending motion for new trial and any appeal that might follow." Associate counsel was granted permission to withdraw on October 23, 2000. No new counsel was appointed, and lead counsel remained counsel of record. Throughout this time, no attempts were made to revive or otherwise pursue the Petitioner's motion for new trial.

On April 29, 2003, associate counsel was "reappointed to represent the [Petitioner] to the conclusion of all trial court matters." On October 9, 2003, a joint motion between associate counsel and the Petitioner was prepared and served on the State "to reschedule" the motion for new trial hearing, which was set, according to the motion, for October 16, 2003. The hearing was rescheduled for December 11, 2003; on that day, it was reset for January 13, 2004, in order to allow the State time to file a response and the Petitioner to amend the motion for new trial.

Thereafter, the Petitioner filed an amended motion for new trial on January 8, 2004, which added five additional grounds for relief. Again, the issues were merely bare allegations of one sentence each without legal argument or citation to authority. Moreover, three of the five were merely restatements of issues raised in the original 1996 motion for new trial. The two new issues raised in the amended motion were sufficiency of the evidence and the trial court's sua sponte issuance of a jury instruction on criminal responsibility after the jury had already begun deliberations. Also, on January 8, 2004, a waiver from the Petitioner was filed. In the document, the Petitioner waived the following:

---

[3] For the purpose of clarity, we will refer to the Petitioner's trial attorneys collectively as "trial counsel" and individually as "lead counsel" or "associate counsel."

[T]he [Petitioner] has been advised he has the right to be transported . . . for the purpose of attending the [m]otion for [n]ew [t]rial which has previously been filed on his behalf. Having been advised of this right, [the Petitioner] waives his right to be present, and requests the [m]otion be heard in his absence.

The State's response to the Petitioner's amended motion for new trial, which included detailed legal argument, was filed on January 12, 2004. In the State's response, it was argued that the trial court had lost jurisdiction to hear the Petitioner's motion for new trial when it was stricken on October 17, 1996, and that the Petitioner had abandoned any timely pursuit of said motion. On January 23, 2004, the Petitioner's "response to the State's petition" that the trial court was "without jurisdiction to hear" the amended motion for new trial was filed. The next document in the record was a March 24, 2004 order designating the case as extended and complex for purposes of Rule 13, Tennessee Rules of the Supreme Court. Thereafter, almost another entire year elapsed before the trial court's order denying the Petitioner's motion for new trial was filed on March 15, 2005.

In the order, the trial court stated that the "matter was submitted on briefs in December 2003." The trial court included a footnote in the order indicating that the status of preparation of the transcript in the Petitioner's case was still unknown to the trial court. The trial court noted, "It appears the co-defendant . . . pursued his appeal and[,] in so doing[,] raised issues of collateral estoppel with reference to the [Petitioner's] case. At that time, [the co-defendant's] counsel obtained a transcript of [the Petitioner's] trial proceedings. Shortly thereafter, the amended motion for new trial was filed." The trial court then went on to restate the seventeen grounds listed in the Petitioner's motion for new trial and the five grounds added in the amended motion for new trial. The order was detailed and contained findings of fact and conclusions of law. The trial court found that the Petitioner's grounds did not entitle him to relief. Specifically, the trial court determined that the Petitioner's convictions were supported by sufficient evidence, reasoning that the

evidence was more than sufficient for the jury to conclude that the [Petitioner] gained access to the Taco Bell upon a false premise; that he retrieved items he previously placed in the ceiling of the men's restroom; that he blew open the safe and took money belonging to Taco Bell; that [the] killings recklessly occurred during the robbery with a deadly weapon; and that the victims suffered great injury (death)[.]

On July 11, 2005, associate counsel filed a motion to withdraw from further representation of the Petitioner. In the motion, associate counsel noted that the co-defendant's attorneys had obtained a "timeline" from associate counsel's office and that

the trial court had "ruled that this constituted a waiver of the attorney-client privilege[.]" Associate counsel averred, "Based upon the [c]ourt's prior ruling, it is apparent that [the Petitioner's] counsel will be called as a material witness at future proceedings regarding the [co-defendant's] case, both state and federal. This will create a direct conflict with maintaining the confidentiality between attorney and client." Associate counsel also indicated that lead counsel was then employed with the United States Government and, thus, prohibited from representing the Petitioner. Thereafter, on August 10, 2005, the trial court entered an order allowing "trial counsel," being "unable to represent the [Petitioner] in his direct appeal[,]" to withdraw. The trial court appointed new counsel at that time. That lawyer was later removed due to a conflict of interest because the Petitioner had acted as a "jailhouse lawyer for" one of the lawyer's former clients by drafting the inmate's petition for post-conviction relief which alleged ineffective assistance of counsel therein. Another lawyer was appointed, who represented the Petitioner during his direct appeal proceedings ("appellate counsel").

After the denial of his motion for new trial, the Petitioner filed a timely notice of appeal. On direct appeal, the Petitioner argued the following:

(1) that he was denied due process in the delay of the preparation of his trial transcript and of the hearing on the motion for new trial; (2) that the trial court erred in not reopening the hearing on the motion for new trial; (3) that the trial court erred by permitting cameras in the courtroom during the trial; (4) that the cameras "invaded" the deliberations of the jury; (5) that the trial court should have changed venue due to the influence of pretrial publicity; (6) that the trial court erred by admitting photographs of the victims; (7) that the trial court erred by admitting DNA evidence; (8) that the trial court erred by certifying a [S]tate witness as an expert in DNA analysis; (9) that the trial court erred by admitting the testimony of the medical examiner; (10) that the trial court erred by permitting the medical examiner to utilize demonstrative aids during his testimony; (11) that the evidence was insufficient to support his convictions under a theory of criminal responsibility for the conduct of another; (12) that the evidence was insufficient to support his convictions under a theory of direct liability; (13) that the trial court violated his due process rights by "forcing" the [S]tate to proceed on inconsistent theories at his trial and the trial of his co-defendant; (14) that the trial court erred by interrupting jury deliberations to provide an instruction on criminal responsibility for conduct of another; (15) that the convictions for especially aggravated robbery and felony murder violate double jeopardy principles; (16) that the evidence was insufficient to support the finding that the murders were heinous, atrocious, or cruel; (17) that the trial court erred by failing to instruct the jury on certain non-

statutory mitigating factors; and (18) that the trial court erred by imposing consecutive sentencing.

Matthews, 2008 WL 2662450, at *1. Ultimately, this court affirmed the Petitioner's convictions in an opinion issued on July 8, 2008. In discussing the Petitioner's issue concerning the timeliness of the motion for new trial, although not condoning the length of the delay, we determined that Petitioner's due process rights were not violated by the delay, relying on the fact that he had failed to establish prejudice from the delay. Id. at *10. No permission to appeal to the Tennessee Supreme Court was filed at that time. See Tenn. R. App. P. 11.

On November 27, 2013, the Montgomery County Circuit Court Clerk's Office received a pro so filing from the Petitioner entitled "Motion for Determination of Status of Pending Post-Conviction Petition or[,] in the alternative[,] Motion for an Evidentiary Hearing to Determine why the Original Post-Conviction Petition Filed on July 23rd, 2009 had not been Properly Adjudicated." The motion contained, as an attachment, a copy of the Petitioner's purported pro se July 2009 petition, although no such petition was ever received by the Montgomery County Circuit Court Clerk. A hearing was held on September 9, 2014, which dealt with the timeliness of the Petitioner's petition for post-conviction relief. The trial court entered an order on October 8, 2014, finding that due process tolled the one-year post-conviction statute of limitations. The order also granted the Petitioner a partial delayed appeal, permitting him to file a delayed petition to rehear in this court or a delayed Rule 11 application with the Tennessee Supreme Court. No petition to rehear was ever filed in this court; however, the Petitioner did file an untimely Rule 11 application with the Tennessee Supreme Court. After our supreme court ordered the Petitioner to show cause why the filing deadline should be waived,[4] the court ultimately denied the Petitioner's Rule 11 application on April 10, 2015.

The post-conviction court, upon conclusion of the delayed appeal, allowed the post-conviction proceedings to continue. The post-conviction court permitted a "hybrid representation" during the post-conviction proceedings, allowing the Petitioner to operate as co-counsel with appointed counsel and requiring both the Petitioner and counsel to sign all pleadings. Several petitions and amended petitions appear in the record. Besides the July 2009 petition, additional petitions were filed in December 2013, July 2016, and February 2017. The post-conviction court addressed the issues as presented in the final amended petition that was prepared by counsel and filed on February 1, 2017.[5] In the amended petition, the Petitioner raised the following claims:[6]

---

[4] No disposition of this show cause order is apparent from our supreme court's records.

[5] The Petitioner presented evidence at the post-conviction hearing in keeping with this amended petition.

-6-

(1) "Claims related to the thirteenth juror rule," arguing (a) that "the trial judge was not competent to sit as thirteenth juror due to his exposure to the ex parte information provided by trial counsel" and (b) that appellate counsel provided ineffective assistance by "fail[ing] to argue on appeal that the failure of a competent judge to rule as [thirteenth] juror rendered the judgment void";

(2) "Claims related to trial counsel's conflict of interest," specifically that trial counsel was ineffective (a) because an "actual conflict of interest existed" based upon a "breach of attorney-client confidentiality" and (b) because trial counsel failed "to adequately represent [the P]etitioner in post-trial motions due to the conflict of interest";

(3) "Claims related to [the Petitioner's] absence during portions of trial," specifically (a) that trial counsel rendered ineffective assistance by "fail[ing] to object and demand [the Petitioner's] presence at trial" and by "fail[ing] to raise [the Petitioner's] absence as an issue in the motion for new trial," and (b) that appellate counsel also provided ineffective assistance by "fail[ing] to raise [the Petitioner's] absence as an issue on direct appeal";

(4) "Claims relating to jury instructions," arguing (a) that trial counsel was ineffective for "fail[ing] to request a jury instruction on facilitation" or

---

[6] The Petitioner also raised additional claims in the February 1, 2017 petition regarding trial counsel's failure to adequately cross-examine the medical examiner; trial counsel's failure to call witnesses to contradict testimony from the State's eyewitnesses and to present evidence to refute motive; trial counsel's failure to call Larry Underhill during the sentencing phase to testify in mitigation regarding the co-defendant's being the actual shooter; trial counsel's failure to include the inconsistent theory argument in the motion for new trial; trial counsel's failure to preserve the issue of Frankie Sanford's identification; appellate counsel's failure to raise the issue related to Frankie Sanford on appeal; the State's Brady violations for failing to disclose Larry Underhill's statement and for failing to disclose information regarding investigations into the medical examiner; the State's violation of the Petitioner's due process rights by presenting and allowing false testimony to go uncorrected; and claims raised by the Petitioner in his role as co-counsel, which included trial counsels' failure "to put on evidence or otherwise investigate matters to refute motive and opportunity" and failure "to properly argue the legal standard set forth in State v. Odom to show the inapplicability of T[ennessee] C[ode] A[nnotated] [section] 39-13-204(i)(5)," as well as appellate counsel's failure to argue Odom on appeal. However, although the Petitioner raised these grounds for relief in his petition, they have been abandoned on appeal. Therefore, these additional issues are considered waived. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002) (refusing to address issues raised in the trial court but abandoned on appeal). We will focus our review to those issues that are the subject of this appeal.

"request a lesser-included jury instruction for second-degree murder," and (b) that appellate counsel was ineffective for "fail[ing] to adequately cite to authority to support [the Petitioner's] claim that [the] supplemental jury instruction was given in error"; and

(5) "The cumulative effect of all error at trial and on appeal violated [the Petitioner's] constitutional rights."

At the May 2017 post-conviction hearing,[7] the Petitioner's sister, Veronica Randolph testified that she attended the Petitioner's 1996 trial. According to Ms. Randolph, the Petitioner was not present in the courtroom "[f]or part of the time" during closing arguments. Ms. Randolph explained that she was "wondering" where the Petitioner was because "the judge was giving the jurors instructions and everybody else was in the court[room]." When she asked the Petitioner later why he was absent, the Petitioner "said he didn't know." The Petitioner's cousin, Lolita Chenise Randolph, also testified that the Petitioner was absent from the courtroom during "the part when the judge was giving directions to the jury."

Lead counsel testified that he was appointed, along with associate counsel and multiple investigators, to represent the Petitioner on these murder charges and that over the course of his representation, he met with the Petitioner "many" times. According to lead counsel, other members of the defense team were sometimes present for the meetings as well. Lead counsel indicated that "the base of operations" was at associate counsel's office and that the Petitioner's discovery and investigation materials were kept there. Lead counsel relayed that his "primary obligation" at trial was to "handle the witnesses" and make the opening and closing statements. He also conveyed his familiarity with the discovery and investigation materials in the Petitioner's case.

Lead counsel recalled that while the jury was deliberating, he left and "drove back to the city" to take care of something. Upon his return, associate counsel informed him that the trial judge had issued a supplemental instruction on criminal responsibility during his absence. Lead counsel lodged an objection and asked that he be permitted additional closing argument to address the supplemental instruction. However, the trial judge denied his request. Lead counsel believed that the Petitioner was present in the courtroom when he lodged the objection.

Lead counsel affirmed that a timeline of events had been prepared in preparation for the Petitioner's trial and that the timeline referenced statements that were directly

---

[7] A substantial portion of the evidence presented at the post-conviction hearing concerned many of the issues that the pro se Petitioner has now abandoned on appeal. We will limit our recount to evidence relevant to the Petitioner's claims properly presented for appellate review.

attributable to the Petitioner from interviews with him. Lead counsel maintained that prior to the Petitioner's trial, he did not share any information he learned during his representation of the Petitioner with the co-defendant's attorneys, Michael Terry and Stephanie Gore. When asked if he ever authorized the co-defendant's attorneys to come to the "war room" in associate counsel's office and "review[] the investigative materials that [they] had gleaned during the investigation," lead counsel replied, "Setting aside the timeline, I don't recall extending an invitation to either of the two to come to the war room. . . . I think I recall saying . . . you can review the statements of witnesses that we had. I'm confident that we made that available to them." Lead counsel averred that the Petitioner never consented to allowing the co-defendant's lawyers access to the witnesses' statements or any other portions of "his client file," and lead counsel affirmed that the Petitioner was likely never asked.

Lead counsel did not recall "personally" making any decision to redact the timeline nor did he remember ever disclosing the redacted timeline to the co-defendant's lawyers. He claimed that he was not even "aware that there was a redacted timeline." He explained that these events may have occurred after his departure to Cambodia in November 1996 to "train defense lawyers." According to lead counsel, he thought that he was out of the country "when this timeline thing developed"; however, he was made "aware that it was an issue." Lead counsel also believed that he discussed the inadvertent disclosure with the Petitioner.

Lead counsel acknowledged that sometime around 2008, he "answered some interrogatories" in the co-defendant's post-conviction case. In those interrogatories, lead counsel described "the circumstances of how the unredacted timeline was obtained" by the co-defendant's attorneys: "A member of the [co-defendant's] defense team was given access to a redacted copy, which was in our office. While there the defense team member discovered the unredacted copy, photocopied it without permission and then left with it." Lead counsel further stated therein that he "was shocked that [the co-defendant's lawyer] had engaged in this conduct." Lead counsel did not recall "tak[ing] any steps to retrieve" the unredacted timeline, despite being certain that the timeline "was a privileged document." Moreover, lead counsel did not take any steps to report the co-defendant's lawyer's conduct to the Board of Professional Responsibility.

When asked if he agreed "that regardless of whether [he] w[as] still acting as attorney of record when [he] became aware of . . . the disclosure of the timeline to the [co-defendant's] defense team that [he] had an obligation to still take efforts to protect that privilege," lead counsel replied, "Theoretically yes. If I had been here, yes." Lead counsel confirmed that "some effort should have been made to get it" returned. Lead counsel also noted that associate counsel hired outside counsel to represent them regarding the inadvertent disclosure.

Lead counsel further testified that in the interrogatories from the co-defendant's case, he acknowledged engaging in two conversations with the co-defendant's "defense team," during which he expressed his belief that the co-defendant was innocent of these charges. Lead counsel indicated that these conversations took place after the Petitioner's trial, and he confirmed that he never told the Petitioner about these discussions.

Lead counsel was then asked to describe the details surrounding his ex parte communication with the trial judge, which consisted of his telling the trial judge that he believed the co-defendant was innocent. Lead counsel testified that either he or associate counsel called the trial judge's office and relayed their desire to speak with him. According to lead counsel, they then agreed on a date, place, and time to meet. Lead counsel said that they were initially supposed to meet in the "judge's chambers or somewhere at the courthouse." However, the location "got changed because [the judge] had like childcare problems or something," and they "ended up meeting at [the judge's] house as a result of some kind of a conflict[.]" Lead counsel recalled that they followed the trial judge from the courthouse to his home, and lead counsel averred that he did not find this meeting "odd" in any way. According to lead counsel, after his disclosure to the trial judge, the judge "was just saying okay, get it off of you if that's what you want to do," but the trial judge never stopped him or cautioned him about divulging attorney-client privileged information. Lead counsel said that his comments about the co-defendant were "very brief" and that the topic of their conversation then turned to other things. According to lead counsel, although associate counsel was present, he was very quiet during the portion of the conversation concerning the co-defendant. Additionally, lead counsel opined that this conversation likely took place on one of his return trips from Cambodia.

Lead counsel affirmed that he never told the Petitioner of his intention to speak with the trial judge, nor did he tell the Petitioner afterwards. Lead counsel explained that he felt he "had an obligation to do something because[,] . . . based upon [his] investigation of the case, . . . [the co-defendant] had nothing to do with" the Taco Bell crimes, and the co-defendant was facing the death penalty. When asked what he thought the trial judge "was going to do," lead counsel responded, "You know, . . . I wasn't sure. I really wasn't sure. But I thought if there was somebody who could do something it would be [the trial judge]. And I felt that somebody had to do something." Lead counsel was then asked "where, as a lawyer, did [lead counsel] come up with that" as a solution, and lead counsel explained, "As a lawyer my obligation is to protect my client. My client had already been found guilty."

Lead counsel affirmed, however, that his "investigation included statements that [he] knew [the Petitioner] had given . . . privately," that he had just told the trial judge that the co-defendant was innocent based upon his investigation of the Petitioner's case,

-10-

and that the Petitioner's motion for new trial was still pending in front of the trial judge at that time. Lead counsel said he "now" saw the error of his ways, but he "was afraid that an individual who [he] knew had nothing to do with this could die." Lead counsel further explained his decision as follows:

> [A]ll I know is this: If I believed that what I said was going to [a]ffect [the Petitioner] in such a way that it would be detrimental to [the Petitioner,] I wouldn't have done it; however, if I had to choose to either say nothing or at least say something, to do something for [the co-defendant], even though [the co-defendant] was not my client, I–I couldn't do nothing . . . . That was the problem. I couldn't just sit and do nothing at all.

Lead counsel agreed that the trial judge, at that time, still had "the obligation to sit as the [thirteenth] juror in ruling on [the Petitioner's] motion for new trial." According to lead counsel, after the ex parte communication, he believed that associate counsel would handle the motion for new trial because lead counsel intended to return to Cambodia. Lead counsel opined that despite the information contained in the unredacted timeline and the ex parte communication, there "was still enough to deny the new trial motion on the weight of the evidence[.]"

Lead counsel confirmed that after the meeting with the trial judge, he did not file a motion seeking to withdraw from the Petitioner's case, nor did he file anything to have the trial judge recused based upon the information lead counsel had conveyed to him. Lead counsel was unsure of how he was ultimately relieved from representing the Petitioner, and he did "not remember seeing any kind of order granting [him] leave to withdraw."

When asked about the delay in having the Petitioner's motion for new trial adjudicated, lead counsel said that he felt he needed to have the transcript prepared in order to adequately address all potential issues. Lead counsel averred that while the motion for new trial was pending, he spoke with the Petitioner "on a regular basis." He could not remember whether he specifically advised the Petitioner about "the next steps in the case, the time periods in which those steps had to occur[,]" although he thought he would have done so. Lead counsel also said his normal practice was to discuss with the client what issues were to be raised in the motion for new trial, but he could not recall, due to the passage of time, whether he did so in the Petitioner's case.

Associate counsel testified that he was appointed to the represent the Petitioner in 1995 and that he and lead counsel divided responsibilities. Associate counsel maintained that his "primary role" in the Petitioner's case was to obtain a change of venue and have the case moved out of Montgomery County. According to associate counsel, "[o]ur goal was to achieve the best possible outcome under the facts as they were presented[,]" and

included in that calculation was the possibility of four death penalty sentences. Associate counsel was ultimately successful in receiving a change of venue. Moreover, the Petitioner received four sentences of life without the possibility of parole instead of the death penalty.

Associate counsel testified that he did not perform an "in depth discovery" review in the Petitioner's case, indicating that such was unnecessary for his primary responsibility. Moreover, associate counsel indicated that he "had some client meetings with" the Petitioner but that he "was not present for all client meetings." According to associate counsel, the Petitioner met mostly with lead counsel and Mr. Ron Lax, one of the investigators. Regarding the specific defense set forth on the Petitioner's behalf, associate counsel affirmed that "it involve[d] other people['s] being inside the Taco Bell restaurant." Associate counsel noted that the co-defendant was called as a witness at the Petitioner's trial and that the co-defendant invoked the Fifth Amendment.

Associate counsel stated that he was present in the courtroom when the court charged the jury in the Petitioner's case. Associate counsel also recalled the trial judge issuing a sua sponte instruction on criminal responsibility. However, associate counsel "had no independent recollection of whether [the Petitioner] was present or not present" for the criminal responsibility instruction. Associate counsel affirmed that his "normal procedure" would have been to object if the Petitioner was absent. Associate counsel was able to recall that lead counsel was not present when the additional instruction was given because lead counsel "had gone to take care of some business." Associate counsel acquiesced that the Petitioner was entitled to the representation of two attorneys at that time.

Associate counsel relayed the details surrounding the ex parte communication with the trial judge that took place "within months" after the Petitioner's trial had concluded. He testified that towards the ends of a day, he and lead counsel went to Springfield where the trial judge was holding court and indicated to the trial judge that "there was something [they] needed to discuss with him." Associate counsel continued, "There was nothing there, and he invited us to come to his residence, which we did."

When asked what was the purpose of their trip to visit the trial judge, associate counsel explained that he and lead counsel "had concerns[,] because based upon [their] investigation of the case[, the co-defendant] had nothing to do with this situation" and "he was facing the death penalty." Associate counsel said that lead counsel "decided that [they] needed to tell the judge that based upon our investigation that [the co-defendant] was innocent." Associate counsel maintained that they made "a moral and ethical decision" to inform the trial judge, and he asserted, "I think we were very clear that we did not reveal any attorney-client information." According to associate counsel, the conversation at the trial judge's residence lasted between thirty minutes to an hour.

Associate counsel affirmed that he did not seek the Petitioner's permission to speak with the trial judge, nor did he tell the Petitioner about the meeting until he withdrew many years later. Associate counsel averred that he and lead counsel did what they thought "was appropriate" given the situation, but associate counsel did not consider withdrawing from the Petitioner's representation at that time.

Finally, associate counsel confirmed that the trial judge disclosed the ex parte communication on the record at the co-defendant's motion for new trial hearing in 2000. The co-defendant's motion for new trial transcript, which was read, reflected that the trial judge stated the following: "And it was that their investigation led them to conclude that [the co-defendant] was not at the Taco Bell, and that that was based upon information that they had received, in part, directly from [the Petitioner]." Associate counsel disagreed with trial judge's assessment.

Associate counsel confirmed that his office had been used for "trial prep" and that there was a "war room" at his office, which housed items related to the Petitioner's case. Associate counsel maintained that there was no "joint defense agreement with the [co-defendant's] defense team" and that he did not purposefully share any privileged information with the co-defendant's attorneys. Nonetheless, according to associate counsel, the same investigating firm that had represented the Petitioner was going to represent the co-defendant, so, after the Petitioner's trial, the co-defendant's lawyers were given access to the war room in order to review "the interview notes that they had previously taken of witnesses." No objection was lodged to the investigators' working both cases; a decision for which associate counsel could not provide an explanation. Associate counsel averred that "nothing dealing with [the Petitioner] was going to be shared[,]" and he claimed it was never his "intent directly, indirectly or any other way to reveal or release any privileged information to anyone."

Specifically, regarding the unredacted timeline, associate counsel stated that it "was months after" the co-defendant's trial before he became aware that the timeline had been removed from the war room. Associate counsel indicated that he and lead counsel, who had returned from Cambodia at that time, were told during a meeting with the co-defendant's attorneys. According to associate counsel, "the timeline [was] redacted for the sole purpose of being able to provide it" to the co-defendant's lawyers. In associate counsel's opinion, it "was very clear that the reason for redaction was that there should be no attorney-client information contained in that document."

When asked if he had "authorized either Ms. Gore or Mr. Terry access to [the Petitioner's] materials" held in his office, associate counsel replied as follows: "They were authorized to have access to certain materials, which consisted of witness statements that did not pertain [to] anything of [the Petitioner's that] was attorney-client, and they were authorized access to a redacted timeline, which everything had been

redacted regarding anything pertaining to attorney-client information." Additionally, associate counsel indicated that Ms. Gore was the one who most often came to his office to review the records and averred that she was told there were "limits to what [she] could look at" in the war room. Associate counsel affirmed that Ms. Gore was left alone in the war room. However, in associate counsel's opinion, "it was clearly understood and explained that there were certain statements that [Ms. Gore] could copy and there was a redacted timeline, and that was the limitation of the information that [they] were providing to [the co-defendant's] defense team." According to associate counsel, Ms. Gore was never given unfettered access to everything in the war room.

After being informed by the co-defendant's attorneys that they had the unredacted timeline in their possession, associate and lead counsel "initiated a letter to Ms. Gore and Mr. Terry to return the information and make no copies." According to associate counsel, they also had a meeting with the co-defendant's lawyers and requested that the document be returned, to no avail. Associate counsel indicated that he was "surprised" by Ms. Gore's behavior, but he acknowledged that no ethical complaint based upon her behavior was ever filed.

Associate and lead counsel also obtained independent counsel to represent them regarding the inadvertent disclosure. Nonetheless, associate counsel acknowledged that he did not take any steps to withdraw from the Petitioner's case upon learning of the disclosure or retaining his own counsel. In addition, associate counsel did not recall ever informing the Petitioner about the inadvertent disclosure of the unredacted timeline to the co-defendant's attorneys, which included the Petitioner's incriminating statements.

Associate counsel affirmed that he testified at the co-defendant's motion for new trial hearing in 2000 and that at that time, he testified "at least, partially, about the disclosure of this [unredacted] timeline." Associate counsel indicated that he did not get authorization from the Petitioner "to share any of his client file with anyone," much less ever seek or obtain a waiver from the Petitioner to testify about privileged information. When asked if he remembered "working with Ms. Gore to draft an affidavit that was . . . intended to be signed by [the Petitioner] in support of" the co-defendant, associate counsel responded that he had "a vague recollection of something to that [e]ffect." Associate counsel was able to recall that the Petitioner never signed any affidavit, though.

Associate counsel affirmed that he represented the Petitioner through the completion of the motion for new trial proceedings. When asked if he met with the Petitioner following the Petitioner's jury trial until the motion for new trial was adjudicated, associate counsel replied that he had met with the Petitioner "either once or twice at Turney Center"[8] and possibly "met with him at one of these facilities in west

[8] Turney Center Industrial Complex is a state prison in Hickman County.

-14-

Tennessee." Associate counsel acknowledged writing a March 17, 2005 letter to the Petitioner, advising the Petitioner that the Petitioner's motion for new trial had been denied, enclosing a copy of the order, advising the Petitioner that a notice of appeal must be filed within thirty days, and enclosing a pro se notice of appeal, along with a self-addressed, stamped envelope. Associate counsel indicated that at the time he wrote the letter, he had not been granted permission to withdraw from the Petitioner's case. In addition, associate counsel acknowledged that he had an obligation to file a notice of appeal on behalf of an indigent defendant he had been appointed to represent.

Associate counsel identified a motion to withdraw he ultimately filed on July 11, 2005, in which he noted that the co-defendant's attorneys had obtained the unredacted timeline from his office and that the trial court had ruled that this constituted a waiver of the attorney-client privilege. Associate counsel further stated in the motion to withdraw that it was now a "direct conflict" of interest for him to further represent the Petitioner because he would be called as a material witness in the future regarding the co-defendant's case. Associate counsel then agreed that "the reason of the timeline existed as early as before the [co-defendant's] trial in 1997" and that he testified as "a material witness[] as early as the year 2000[.]" Associate counsel could not provide any explanation for why he had not chosen to withdraw earlier.

When asked about why the motion for new trial proceedings lingered, associate counsel explained, "I think, if I remember correctly, there was real issues in Montgomery County at the time when they had a tornado, and also with the transcripts and the record." Associate counsel could not recall if the motion for new trial was submitted on briefs or whether a hearing took place.

Michael Terry testified that he, along with his law partner, Stephanie Gore, represented David Housler, the Petitioner's co-defendant, on charges relating to the Taco Bell robbery and murders. Mr. Terry stated that they spoke with the Petitioner's lawyers about "strategies that were being . . . deployed" on the Petitioner's behalf, but Mr. Terry did not recall having any "formal joint defense agreement" with trial counsel. Mr. Terry explained, "We both—to a certain extent before their trial and to maybe a larger extent afterwards they shared information with us, and we discussed—we discussed the case with them." Specifically, Mr. Terry recalled a conversation with trial counsel where they told Mr. Terry and Ms. Gore that the co-defendant was innocent. According to Mr. Terry, when Ms. Gore asked "how do [they] know that," trial counsel "said nothing." Mr. Terry surmised that trial counsel were legally prohibited from sharing any additional information they had obtained from their client in that regard. According to Mr. Terry, "there were other meetings and other information exchanged" as well. Mr. Terry also conveyed that he and Ms. Gore had access to the Petitioner's "defense team war room," which housed "[b]oxes and boxes of investigation" and "there were files all over." Mr.

Terry opined that trial counsel were "excellent lawyers," who had conducted "a thorough investigation."

At some point, Mr. Terry became aware of both a redacted and an unredacted timeline covering the relevant events surrounding the Taco Bell murders and robbery that had been prepared for the Petitioner's defense. Trial counsel had provided them with a copy of the redacted timeline, but Ms. Gore later acquired a copy of the unredacted timeline. According to Mr. Terry, he was on a trip when he spoke with Ms. Gore, who informed him of the following:

> [S]he told me that she had gone to this room where this information was. And [associate counsel] had directed her to certain boxes that she was—she could have access to and that she had gone beyond his direction and gone to other boxes and she had found the unredacted timeline; and it was there. And she said it—it confirms what they told us that [the co-defendant] didn't have anything to do with Taco Bell, what should we do with it? And, again, whether it was in that conversation or in a second conversation, whether she had taken it or we agreed on that conversation to take [it], I cannot recall today, but we—we agreed to take it, or she had taken it, and we acquired the unredacted timeline in that way.

Mr. Terry confirmed that trial counsel did not give them permission to take the unredacted timeline. Furthermore, Mr. Terry believed that they told trial counsel they possessed the unredacted timeline sometime prior to the co-defendant's November 1997 trial, and he agreed that trial counsel ultimately obtained their own representation regarding the inadvertent disclosure of the document.

Additionally, prior to the co-defendant's trial, Mr. Terry became aware that trial counsel had engaged in an ex parte communication with the trial judge after the completion of the Petitioner's trial. Mr. Terry recalled, "And the information that was given to me was that [the trial judge] had those two lawyers for dinner after the [Petitioner's] trial and that they told him after dinner that—that [the co-defendant] was innocent, that [the co-defendant] did not commit the Taco Bell murders." Mr. Terry believed that trial counsel called him and informed him of this meeting with the trial judge. According to Mr. Terry, the parties discussed, prior to the co-defendant's trial, the "the issue of recusal" of the trial judge, and all parties agreed to the trial judge's remaining on the case.

Ms. Gore likewise testified that she and Mr. Terry had meetings with trial counsel, although she did not remember there being "any kind of written joint defense agreement in place between the two defense teams[.]" Ms. Gore also recalled meeting the investigator who had worked on the Petitioner's case.

Ms. Gore confirmed that she was granted access to the Petitioner's "defense team war room," which was located in associate counsel's law office. Ms. Gore described it as "a small library which contained all of the [Petitioner's] files that [she] was aware of." According to Ms. Gore, on one occasion while she was in the war room, associate counsel provided her a copy of the redacted timeline. Ms. Gore indicated that when associate counsel gave her the timeline, he said; "I don't know why [lead counsel] redacted this; I don't know what good it's going to really do you; I wish I could give you the unredacted timeline."

Furthermore, Ms. Gore relayed that there were no "ground rules" for her while she looked through the Petitioner's files and that associate counsel told her that she "could copy anything in that room that [she] found would be helpful to" the co-defendant. Ms. Gore described that she was alone in the war room "looking through" "a stack of a lot of different timelines" when she discovered the unredacted timeline:

> Most of the timelines that I saw, some of them had redaction, but I just remember opening up a timeline and going to critical portions, specific days, and I just remember reading something that I had not read before and it was actually about [the Petitioner's] being up in the ceiling. And when I read that I knew that I had not read that before. And I reread it, and—and then I looked at my timeline and realized that it was redacted, and I kept reading it and realized it was an interview of [the Petitioner]. I believe that Gloria Shettles[9] may have conducted that interview, but I can't say for certainty today.

When asked what "did [she] do with the unredacted timeline at that point," Ms. Gore replied,

> My law partner, who was lead counsel at that time, was unavailable, I could not reach him; no one was in the law office at that time, I was by myself, and I did what I thought was in the best interest of my client and I copied the timeline. And I did as I always did after I finished going through materials, I put everything back exactly as I'd found it and I left.

Ms. Gore said that she later informed Mr. Terry that she had taken the timeline, though she could not remember if that conversation was by phone or when Mr. Terry returned from his trip.

Ms. Gore explained that the difference between the copy she had previously been provided by associate counsel and the one she found that day was that "it now had

---

[9] Ms. Shettles was another investigator who worked on the Petitioner's case.

statements in it that were previously redacted that were attributed to [the Petitioner.]" Specifically, Ms. Gore explained that the redacted timeline did not include the statement by the Petitioner about coming out of the bathroom ceiling around 2:30 a.m. Ms. Gore agreed that the information contained in the unredacted timeline was "privileged communications." Nonetheless, according to Ms. Gore, she did not "feel that she was doing anything wrong" by copying the timeline because she "had authority to look at anything and copy anything in that office." Ms. Gore indicated that they did not inform trial counsel that they possessed the timeline until sometime after the co-defendant's trial was over. Ms. Gore confirmed that trial counsel then hired legal counsel to represent them concerning the inadvertent disclosure of the document.

Regarding trial counsels' ex parte communication with the trial judge, Ms. Gore believed that she was told of the meeting by Mr. Terry, who had heard the details from lead counsel. Ms. Gore recalled being informed that the meeting occurred at the trial judge's home and that the trial judge was told that the co-defendant was innocent. Ms. Gore recollected that before the co-defendant's trial, she was present during a meeting with the parties where the trial judge's recusal from the co-defendant's case was discussed due to the fact that trial judge had been told the co-defendant was innocent, though she could not recall for certain if this discussion referenced the ex parte meeting specifically. Regardless, she and Mr. Terry wanted the trial judge to remain on the case because they thought it was in the co-defendant's "best interest," specifically because the trial judge had heard the proof at the Petitioner's trial, had been told the co-defendant was innocent, and "had some indication that there was exculpatory evidence in possession of [the Petitioner.]" In addition, Ms. Gore remembered the trial judge's sua sponte disclosing on the record this ex parte communication during the April 2000 hearing on the co-defendant's motion for new trial. Ms. Gore believed that this was the first time such information was put into the record.

Ms. Gore also remembered a meeting where she and Mr. Terry met with trial counsel, who told them that the co-defendant was innocent. Being new to the practice of law at that time, she "couldn't wrap her head around" such an affirmation. When she inquired "how do you know," "[Lead counsel] didn't say anything, just looked at [her], and [Mr. Terry] turned to [her] and said he knows because his client told him."

Ms. Gore recalled "a discussion that [she] had back and forth with [associate counsel] regarding a proposed affidavit that [she was] wanting [the Petitioner] to sign for the benefit" of the co-defendant. Ms. Gore believed that this back-and-forth discussion took place after the Petitioner's trial but before the co-defendant's trial. According to Ms. Gore, the nature of the affidavit was essentially to have the Petitioner aver "that he did not know [the co-defendant]; he'd never seen [the co-defendant;] . . . [h]e had a brief visit with him, . . . in lockup or something[.]" Ms. Gore confirmed that associate counsel

would have obtained the information in the affidavit exonerating the co-defendant directly from the Petitioner. Nonetheless, the Petitioner refused to sign such an affidavit.

The trial judge testified that he was a judge in Montgomery County for twenty-five years and four months and presided over the Petitioner's trial and motion for new trial. He also presided over the co-defendant's trial, motion for new trial, and post-conviction proceedings.

The trial judge confirmed that he sua sponte reassembled the Petitioner's jury while they were in deliberations and issued a jury instruction on criminal responsibility, despite the fact that neither side had requested such an instruction. When asked "what precipitated [his] giving that charge," the trial judge replied,

> In his closing argument [lead counsel] said . . . in several ways that [the Petitioner] didn't do this. You know, he said—he would look at the jury and say, words to the effect, [the Petitioner] didn't do this. And the clear impression that I got was that he was trying to introduce, in his argument, that this was done by somebody else that [the Petitioner] may have known . . . .

> So the [S]tate rebutted, didn't say anything about it; and they retired; I retired; and I got to thinking that he had introduced enough to satisfy me that I thought that criminal responsibility for the conduct of another should be . . . instructed, so I reassembled the jury and gave them that instruction, along with an instruction that they shouldn't consider that instruction—give it any greater weight than they would any other instruction that I had given and sent them back in.

Due to the passage of time, the trial judge could not remember whether he also gave an instruction on facilitation, if anyone requested an instruction on facilitation, or provide an explanation why he chose not to do so.

In addition, the trial judge could not recall specifically if the Petitioner was present in the courtroom when he issued the instruction on criminal responsibility, but he explained, "I know my habits and my custom and my tradition and I would not have taken the bench until [the Petitioner] was in the courtroom much less given an instruction in his absence. That never happened." When asked if it was his normal practice "to announce on the record at the start of the court convening, . . . something to the effect of 'let the record reflect that . . . the defendant . . . is now present in the courtroom[,]'" the trial judge responded that he "probably did more times than [he] d[idn't] do it," but he had no recollection of whether that occurred in this instance.

The trial judge was then asked about the ex parte meeting with trial counsel. The trial judge explained that he presided in two counties, Montgomery and Robertson, and that day he was in Robertson County. According to the trial judge, it was Friday, towards the end of a "a nonjury day[]," when trial counsel appeared in his courtroom and sat "down in the back pew." After finishing the docket, he asked trial counsel if they needed to see him, "and one of them indicated that they did." The trial judge testified that he asked whether a representative for the State would be joining them for the meeting and that trial counsel informed him that a State representative was unnecessary because it did not "have anything to do with the [S]tate." The trial judge agreed to speak with them in his office, although he cautioned trial counsel that the conversation "may be short lived" depending upon the subject matter. He initially believed that trial counsel was seeking "approval of fees and things."

Once in the office, the trial judge, seeing as it was "approaching" 5:00 p.m., informed trial counsel that he had dinner plans with his wife when he returned home to Clarksville. The trial judge inquired about how long the conversation was going to last given that it was a forty-five-minute drive home for him, and trial counsel said that they just needed to tell him something and that it would not take "very long." The trial judge assented, "I'll let you say what you came here to say until I decide nothing else should be said."

Despite being given permission to discuss the matter, trial counsel offered to drive back to Clarksville to continue the conversation in order to assist the trial judge in keeping his commitments. The trial judge decided that this would "be easier on [him]" to return to Clarksville first, so they got in their respective vehicles and drove towards Clarksville. The plan was to meet "somewhere in a parking lot" to continue the discussion. However, after they arrived in the parking lot, the trial judge felt the logistics were not "conducive to hav[ing] a meaningful conversation," and he "wasn't comfortable" with the situation. As a result of the trial judge's discomfort, he invited trial counsel to come to his home instead, and they proceeded to his house. Once inside, the trial judge invited trial counsel to sit down and asked them what they wanted to talk about. According to the trial judge, lead counsel then said it was about the co-defendant's case that was proceeding to trial soon. Lead counsel conveyed their belief that the co-defendant was innocent, and they explained that it had been on their conscience and that they could not "sit back and let it happen without telling somebody." However, the trial judge told them that the co-defendant's innocence was "for a jury to decide." He also let trial counsel know that the details of their talk would not be kept secret and that he was going to relay the details of their conversation to the other attorneys involved.

The meeting, which lasted about thirty minutes total in the trial judge's estimation, continued. The trial judge described the following:

>	And [lead counsel] went on to say a couple of things that I guess was trying to, I don't know, illustrate why he felt why he said what he did, and he—he said something like [the Petitioner], I said look . . . you don't need to divulge any—you're about to—sounds like you're about a violate a confidential attorney-client relationship here. And so he said okay.

>	He said I—almost as if I'm not going to [the Petitioner] said this or [the Petitioner]—but it was like our investigation—the totality of our investigation; we know that the jacket that they found on the side of the road that they—that the [S]tate thinks was [the Petitioner's] jacket, it's not his jacket. It's a jacket that was on the side of the road, but it wasn't the jacket.

>	I said [to lead counsel], I don't know why you're telling me this. You ought to just tell the [S]tate. But it was almost as if—if they went and told other lawyers what he wanted to tell me, he felt like maybe he shouldn't do that but it was okay for him to sort of just unload to the judge.

In addition, the trial judge recalled lead counsel's informing him that the Petitioner had made a statement in reference to the co-defendant, specifically telling him that the Petitioner said, "I don't know why this guy wants to get in on this, . . . but if he—if that's what he wants, . . . that's fine with me[.]"

When asked if he felt that trial counsel "were violating attorney-client privilege" during the meeting, the trial judge responded "that was [his] initial thought." He clarified,

>	It was my belief that they had either violated it or they could very— that they could violate in the next sentence that came out of their mouth. Or if they didn't violate it, it was so close. It was enough for me to say who[a], anything you tell me I'm telling the lawyers. And, in fact, you need to beat me to it; you need to go tell them.

The trial judge confirmed that at that time, he did not "take any steps to file any kind" of ethical complaint or other action against trial counsel, reasoning that the Petitioner's trial "was over," despite the fact that "post-trial activity" was continuing. The trial judge affirmed that following trial counsels' disclosure at his home, he did not take any steps to recuse himself from the Petitioner's case or the co-defendant's. Nonetheless, the trial

-21-

judge agreed that he had been subjected to information about the cases that "was outside of a judicial proceeding."

The trial judge indicated that "the next time" he was in Clarksville hearing motions in the co-defendant's case, he called the prosecutor and the co-defendant's lawyers into his office. According to the trial judge, this meeting occurred before the co-defendant's trial commenced, and he provided the lawyers involved in the co-defendant's case with the details of the conversation he had participated in with trial counsel. The trial judge testified that he "got the impression that" the co-defendant's lawyers may have already spoken to trial counsel about the matter. The trial judge stated further that none of the attorneys objected to his continuing on the co-defendant's case. The trial judge confirmed that he later placed the details of the conversation with trial counsel on the record at the co-defendant's motion for new trial hearing held on April 21, 2000. The trial judge explained that the initial meeting with the attorneys in the co-defendant's case occurred in his office, not in the courtroom setting, and that he felt "it was something that needed to be put in the record."

According to the trial judge, he also called the parties involved in the co-defendant's case to his office prior to the co-defendant's post-conviction relief hearing and once more informed them of trial counsels' disclosure. Again, no one objected to his continuing on the co-defendant's case. The trial judge affirmed that the co-defendant's post-trial proceedings "went forward" while the Petitioner's motion for new trial "lingered on and on and on." He affirmed that it was "several years later" before he issued an order adjudicating the Petitioner's motion for new trial. The trial judge confirmed that he admitted the unredacted timeline into evidence, over objection, at the co-defendant's motion for new trial hearing, finding that trial counsel had waived the attorney-client privilege for the Petitioner regarding that document. Accordingly, at the time of his issuing an order on the Petitioner's motion for new trial in 2005, he had engaged in this ex parte communication with trial counsel at his house, as well as had knowledge of the unredacted timeline that was extensively discussed in the co-defendant's post-trial proceedings.

The trial judge agreed that in regard to ruling on sufficiency of the evidence in the Petitioner's motion for new trial, he had "received statements from [trial counsel] saying that they believe that [the co-defendant] was innocent." He then indicated that he may not have believed trial counsels' statements and maintained that the evidence in the Petitioner's case "was beyond any and all reasonable doubt, and not only was it to a moral certainty it was to an absolute certainty that [the Petitioner] planned out and executed four innocent people in a hail of bullets, leaving four dead bodies in a pool of blood[.]" According to the trial judge, trial counsels' statement concerning the co-defendant's innocence did not "affect [him] at all in terms of [his] judgment on the

sufficiency of the evidence that was [ad]duced at the trial." The trial judge then opined that but for trial counsels' effective "lawyering," the Petitioner "would have been on death row."

In addition, the trial judge testified that much later, he "became convinced, based on the research that was done [during the co-defendant's post-conviction proceedings], that the lawyer could waive" the attorney-client privilege, which he believed occurred in this case. The trial judge opined that privilege had been waived when the Petitioner's lawyers "gave over information, files and things like that to the" co-defendant's lawyers. The trial judge did not remember having any discussions with trial counsel about whether the Petitioner had consented to waive the privilege.

Moreover, the trial judge did not recall whether they had a hearing on the Petitioner's motion for new trial. He affirmed that it was "possible" the matter could have been submitted "on the pleadings." The trial judge also explained that the new trial motion "got prolonged, in part," because trial counsel "had mixed feelings about proceeding with the motion for new trial," and their believing that if the Petitioner received a new trial, then it "would give the [S]tate another shot at the death penalty." The trial judge continued,

> [T]hey wanted some case law to develop in that, and said there was a case . . . in the pipeline and that . . . there ought to be a ruling on that pretty soon. And so they didn't want to proceed, because they said in court, that [the Petitioner] didn't know whether he wanted a new trial or not, because if he got a new trial, then he might as very well get the death penalty along with that new trial, and they weren't so sure they wanted to go down that road.

According to the trial judge, he got the "clear impression" from trial counsel that the Petitioner himself "was not sure if he wanted to proceed in a motion for new trial" because he did not want to be exposed to the death penalty upon retrial. The trial judge also noted that neither party "was pushing the motion for new trial" and said that the motion "just got out of sight, out of mind."

The trial judge also affirmed that he allowed associate counsel to withdraw from representing the Petitioner and indicated that associate counsel was "on and off in terms of his representation of" the Petitioner during the post-trial proceedings. Regarding allowing associate counsel to withdraw the first time in 2000, but then reappointing associate counsel in 2003, the trial judge explained that associate counsel wanted to lighten his workload initially because he "had some serious health problems[, c]ancer[,]" but that associate counsel later changed his mind and "wanted to see it through." The trial judge recalled issuing a second order in 2005 allowing associate counsel to withdraw, "essentially finding that there was a conflict for him to continue in the

representation of" the Petitioner. The trial judge maintained, "I think that's based on him representing to me that he and [the Petitioner] had gotten to a point where they just couldn't communicate anymore. That the conflict, I think, it was—was a conflict between the two of them." In addition, the trial judge acknowledged that lead counsel was "out of the picture" for a period of time while the Petitioner's motion for new trial was pending because lead counsel had gone to work for the United States government in Cambodia "trying to set a justice system" there.

One of the four prosecutors who participated in the Petitioner's trial, Steven Garrett, testified that he "[t]ried to" argue at trial that the Petitioner "was criminally responsible for another." In fact, Mr. Garrett asked a witness to explain the concept of criminal responsibility, but an objection was lodged. The question was never answered, and no limiting instruction was given. That witness was called to refute the defense's assertion that the co-defendant was in fact the shooter, according to Mr. Garrett.

Moreover, Mr. Garrett stated that during the "pretrial jury instruction conference," the trial judge "said he was not going to charge criminal responsibility," despite Mr. Garrett's pointing out "that there were some factors in there that gave rise to that charge." Mr. Garrett confirmed that the trial judge later gave the instruction. Mr. Garrett opined that the instruction "was justified based upon the evidence that had been presented." In addition, Mr. Garrett expressed his belief that other people, as well as the Petitioner, were involved in the robbery and murders. He likened the Petitioner to the head of an outlaw gang.

According to Mr. Garrett, he was "present for every moment of trial." Mr. Garrett affirmed that "[e]very time [he] was in" the courtroom, the Petitioner was also there, including during jury instructions. When asked what he would have done if the trial judge started without the Petitioner, Mr. Garrett responded, "I would have stood up and I would have made it known to the judge that the [Petitioner] was not present." This response would have occurred during "all instructional phases," including "the somewhat belated instruction on criminal responsibility," according to Mr. Garrett. Mr. Garrett affirmed that he did not ask for a facilitation instruction, and he could not remember if such a charge was ever discussed.

Mr. Garrett indicated that he was aware of the ex parte communication between the trial judge and trial counsel prior to the co-defendant's post-conviction petition and hearings. In addition, Mr. Garrett confirmed that he never attempted to have the trial judge recused from the Petitioner's motion for new trial proceedings. Mr. Garrett explained that he went to work in another office in May 1997 and did not "really know what was going on" in the Petitioner's case after that time.

The Petitioner testified that he was not present in the courtroom when the trial judge issued the supplemental instruction on criminal responsibility to the jury. The Petitioner claimed that the following day, while the jury was still deliberating, there was another instance when the trial judge addressed the jury and the transcript did not reflect that he was present in the courtroom.[10] He further claimed that he was not present for an "entire hearing" that took place on June 22, citing the transcript's failure to note his presence for that hearing. In support of his argument, the Petitioner cited to specific examples in the transcripts when the trial judge acknowledged that the Petitioner was present in the courtroom.

The Petitioner affirmed that it was his understanding following his convictions "that both attorneys were continuing to represent [him] throughout the filing and . . . arguing for a motion for new trial on [his] behalf[.]" The Petitioner indicated that associate counsel was relieved from representing him in 2000 due to medical issues and that lead counsel was his attorney from 2000 to 2003. The Petitioner further noted that associate counsel was reappointed to his case in 2003. According to the Petitioner, both associate and lead counsel and Mr. Lax came to visit him in late 2003 to discuss "the potential merits of a motion for new trial." At that time, they also discussed a motion to reschedule the hearing on the motion for new trial. According to the Petitioner, he was informed that the prosecutor "had signed off on it," and trial counsel "asked for an extension of time" because they were still waiting on preparation of the transcript. The Petitioner affirmed that he joined in a "joint motion" to reschedule the motion for new trial hearing date.

The Petitioner indicated that at this meeting, they reviewed the issues to be raised in the motion for new trial. One of the issues they discussed was the trial court's sua sponte issuance of the criminal responsibility instruction to the jury after they had already begun deliberating. They also talked about the Petitioner's absence from the courtroom during the supplemental jury instruction. Another issue, which the Petitioner "felt was the strongest," was the trial court's failure to issue any lesser-included offense instructions. According to the Petitioner, they also discussed application of the heinous, atrocious, and cruel factor to the Petitioner's sentence and the State's presentation of inconsistent theories at the Petitioner's and the co-defendant's trial. While they reviewed other issues, these were the "main ones that were never properly brought up" by trial counsel, in the Petitioner's opinion.

According to the Petitioner, sometime later, he signed a waiver in reference to the motion for new trial. When asked to explain his understanding of the waiver, the Petitioner responded,

---

[10] As detailed later in this opinion, the Petitioner seems to be referring to the trial judge's response to two jury questions.

The waiver was a way to show that they had came [sic] and consulted with me, and that the purpose of this amended motion for new trial that they had filed was simply to put something on the record to show activity from the circuit court, because the . . . case had been on the docket for so long.

The Petitioner stated that "the whole purpose of the waiver was to show some activity" on the case. He believed that trial counsel was going to file "another skeletal amended motion for new trial" because they were still waiting on a complete transcript in order to file a final motion. The Petitioner averred that it was never his intention to waive his presence at the motion for new trial hearing and that trial counsel informed him that the waiver was merely "procedural in nature."

The Petitioner testified that he had reviewed the motion for new trial and amended motion, which were "blank skeletal" motions with no factually specific argument. The Petitioner said that as he understood it, trial counsel would file a "[m]ore thorough motion" after the transcript was obtained, but that never happened. The Petitioner noted that there was "[n]othing substantively" different from the motion for new trial and the amended motion. He described the amended motion: "[I]t appears that they just photocopied it or just retyped the same issues over."

The Petitioner was asked if between 1996, when his jury trial concluded, and 2005 when his motion for new trial was ruled upon, he took "any steps to contact [his] attorneys to try to figure out what the holdup was in reference to the hearing on [his] motion for new trial." The Petitioner answered that when he received the letter from associate counsel in March 2005 advising him that his motion for new trial had been denied and to proceed pro se on appeal, he immediately called associate counsel and inquired, "[W]hat's going on? You—what happened to the hearing? What—you know, why aren't the issues brought up, what—what happened? You told me this was procedural. What is this?" According to the Petitioner, associate counsel "just basically said that—look, that answers your question. . . . Basically the judge ruled and that—that was all that can be done." The Petitioner indicated that he then filed a pro se motion to appeal, as well as writing letters to associate counsel and filing "a whole slew of pleadings." The Petitioner explained that he was trying "to get the motion for new trial opened up, since it was within [thirty] days of [the trial judge's] denying it," and he believed that the trial court had the "lawful authority" to give him a hearing on the motion.

The Petitioner said that thereafter, in May 2005, he was "brought . . . into open court" by the trial judge. According to the Petitioner, he also met with trial counsel at that same time, and associate counsel said to the Petitioner that he could no longer represent him and that they should not have represented the Petitioner "after [he] got convicted."

-26-

Next, the Petitioner testified that he did not know the co-defendant's defense team was in possession of the unredacted timeline until the direct appeal opinion in the co-defendant's case was issued in 2004. In addition, he stated that he was not advised of trial counsels' ex parte communication with the trial judge until 2009. According to the Petitioner, if he had known of these events, then he would "have moved the court to disqualify or [remove] . . . [trial counsel] from further representation." The Petitioner noted that trial counsel "became witnesses against [him]" and averred that they could not represent him effectively due to their conflict of interest. Specifically, the Petitioner maintained that he never gave trial counsel "authority to disclose any confidential information to the [co-defendant's] defense team"; that he never gave "them authority to disclose any confidential/privileged information with anyone"; and that he did not authorize them "to divulge facts" learned during their representation of him in order to draft an affidavit in support of the co-defendant.

The Petitioner was asked if there were any issues that "should have been argued by [his] trial counsel, if not at trial[,] in [his] motion for new trial." The Petitioner stated that he was "entitled to [an] instruction on facilitation." He cited to a fifty-two-page document he called the "theoretical guilt matrix," which he asserted provided evidence that "a reasonable juror could have found facilitation, or could have found lesser-included offenses."

The State called appellate counsel to testify. Appellate counsel stated that he did not "recall considering" as an issue on appeal whether the trial judge was competent to make a thirteenth juror determination. He further affirmed that he likewise did not raise any issue about the Petitioner's absence from the courtroom during portions of the trial proceedings. Appellate counsel indicated that he "would have been limited on appeal" to the issues presented by trial counsel in the Petitioner's motion for new trial. According to appellate counsel, he had no knowledge of the ex parte communication between the trial judge and trial counsel.

Appellate counsel explained, "[B]ack then it was my practice that if the client demanded that it be put forward I was going to try and find a way to at least put the phrases in front of the court." Appellate counsel confirmed that he met with the Petitioner while working on his appeal and that the Petitioner sent him "many writings . . . with volumes of things that [the Petitioner] wanted [appellate counsel] to consider." According to appellate counsel, he "tried to raise everything that [he] perceived [the Petitioner] to be demanding [he] raise."

Appellate counsel claimed that on appeal, he raised the issue of ineffective assistance of trial counsel at the Petitioner's behest. However, this court sent appellate counsel an order telling him to reconsider the issue "because it would, by effect, waive [the Petitioner's] right to file a post-conviction petition." The order also stated that the

matter had come to the attention of the court due to a pro se letter from the Petitioner, wherein he stated "that he did not think that the ineffective assistance of counsel argument should be raised." Appellate counsel thereafter withdrew the issue. In addition, appellate counsel affirmed that this court, in the direct appeal opinion, noted several times that the Petitioner's issues were not supported by citations to legal authority and were therefore "denied."

Appellate counsel stated that during the direct appeal process, the Petitioner wanted him removed from the case. However, this court did not allow appellate counsel to withdraw until after the opinion was issued. Due to the passage of time, appellate counsel could not remember if, after being allowed to withdraw, he sent the Petitioner "any kind of pro se application for [R]ule 11 or anything concluding [appellate counsel's] representation" and advising the Petitioner of his further appellate rights.

Following the conclusion of proof, the attorneys "submit[ted]" the case to the post-conviction court without argument. The post-conviction court thereafter denied the Petitioner relief by written order filed on August 7, 2017. Ultimately, the post-conviction court determined that "none of counsels['] actions prejudiced the [P]etitioner and none of the non-ineffective assistance claims entitle[d] [the Petitioner] to relief." This timely appeal followed.

ANALYSIS

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. However, appellate review of a post-conviction court's application of the law to the facts is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998).

The Petitioner, who has filed many voluminous pleadings and documents over the years, has chosen to proceed pro se on appeal.[11] He has filed a 205-page appellate brief that is accompanied by an appendix. He also filed a forty-six-page reply brief.[12] The Petitioner's issues on appeal center around (1) an ex parte communication between the trial judge and trial counsel that took place at the trial judge's residence; (2) trial counsels' inadvertent disclosure of the unredacted timeline to the co-defendant's defense team that contained attorney-client privileged information; (3) the lack of any jury instructions on lesser-included offenses for the felony murder counts; (4) the Petitioner's alleged absence during the issuance of the supplemental jury instruction on criminal responsibility and when the trial judge answered jury questions; and (5) cumulative error. We will attempt to decipher, disentangle, and succinctly address the Petitioner's issues as much as possible.

## I. Conflict of Interest and Privilege-Related Issues

The Petitioner submits that trial counsel was ineffective because an actual conflict of interest existed due to the breach of attorney-client confidentiality and because trial counsel failed to adequately represent the Petitioner in post-trial motions. These issues concern two separate events: (1) trial counsels' meeting with the trial judge during the pendency of the Petitioner's motion for new trial and telling the judge that based upon their investigation of the case, the co-defendant could not have committed the Taco Bell murders and robbery, and (2) trial counsels' allowing the co-defendant's attorneys access to documents in the war room, including an unredacted timeline, which contained privileged, confidential conversations between the Petitioner and his defense team. According to the Petitioner, trial counsels' breaching attorney-client confidentiality on these two separate occasions created a conflict of interest that prevented them from zealously representing the Petitioner's interests post-trial and constituted ineffective assistance of counsel.

Regarding trial counsels' behavior divulging attorney-client privileged information, the post-conviction court determined that "trial counsels['] post-trial actions were deficient and counsel appear[ed] to have labored under a conflict of interest post-trial[.]" In so concluding, the post-conviction reasoned,

> [T]his [c]ourt believes [trial counsel] should have moved to withdraw after
> their post-trial meeting with [the trial judge], clearing the way for conflict-

[11] We note that it has been previously determined by the post-conviction court that the Petitioner has knowingly, intelligently, and voluntarily waived his right to appellate counsel.

[12] This court granted both of the Petitioner's motions for his briefs to exceed the page limitations set by Tennessee Rule of Appellate Procedure 27.

free post-trial counsel. The [c]ourt also finds trial counsel should have done more to protect [the Petitioner's] privileged statements from discovery, and [trial counsel] appear to have done relatively little meaningful work on this case following the return of the jury's verdict.

However, the post-conviction court then determined that trial counsels' deficiencies did not prejudice the Petitioner. The post-conviction court observed that "none of the issues which [the Petitioner] and post-conviction counsel argue should have been raised in the new trial motion and on appeal would have entitled [the Petitioner] to relief." The post-conviction court concluded, "Thus, . . . the lack of prejudice to [the Petitioner] necessarily means [trial counsels'] post-trial actions did not constitute ineffective assistance."

Our first step—identifying the conditions that must be present for the Petitioner to obtain relief—depends on the type of ineffective assistance claim alleged. There are three possible categories of claims.

The first category is deficient attorney performance under Strickland v. Washington, 466 U.S. 668, 694 (1984), which is the "general rule" governing ineffective assistance claims made under the Sixth Amendment to the United States Constitution. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989). In these cases, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). In addition, because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Fields, 40 S.W.3d at 457.

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial

-30-

and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

Second, in United States v. Cronic, 466 U.S. 648, 658 (1984), the companion case to Strickland, the United States Supreme Court indicated that there may be exceptional circumstances "that are so likely to prejudice the accused" that a violation of the Sixth Amendment right to counsel can be presumed. The presumption of prejudice under Cronic presents "a narrow exception to Strickland's holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense." Florida v. Nixon, 543 U.S. 175, 190 (2004). While Strickland applies to most "cases involving mere attorney error," Cronic applies to those cases in which there has been an actual or constructive denial of counsel. Roe v. Flores-Ortega, 528 U.S. 470, 482-83 (2000) (internal quotation omitted); see Strickland, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice."). "A reviewing court will presume prejudice to an accused's right to counsel only when there has been the complete deprivation of counsel at a critical stage of the proceedings, a complete failure to subject the State's case to adversarial testing, or under circumstances of such magnitude that no attorney could provide effective assistance." Berry v. State, 366 S.W.3d 160, 174 (Tenn. Crim. App. 2011).

The third category involves circumstances when a petitioner's attorney actively represented conflicting interests. See Cuyler v. Sullivan, 446 U.S. 335 (1980). In Strickland, 466 U.S. at 692, the Court, referring to Cuyler, stated that "[o]ne type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice" than those to which Cronic applies. In Cuyler, 446 U.S. at 345-350, the Court held that prejudice is presumed when counsel is burdened by an actual conflict of interest. In those situations, prejudice is presumed only if the defendant demonstrates

-31-

that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. at 350 (footnote omitted). A petitioner who fails to show both an actual conflict and an adverse affect is not entitled to relief.

Before we begin our analysis, we noted that the post-conviction court in its order concluded that "trial counsels['] post-trial actions were deficient and counsel appear[ed] to have labored under a conflict of interest post-trial," but that the Petitioner did not suffer prejudice. However, the post-conviction court made such a determination utilizing the Strickland standard without any specific reference to Cronic and Cuyler and did not provide any explanation of its basis for the perceived conflict of interest.

To begin, we will address the presumed prejudice standard announced in Cuyler, which was cited in the February 2017 amended petition prepared by counsel. The Supreme Court's holding in Cuyler is "limited [] to actual conflicts resulting from a lawyer's representation of multiple criminal defendants." Hernandez v. Johnson, 108 F.3d 554, 559 (5th Cir. 1997) (citing Beets v. Scott, 65 F.3d 1258, 1266 (5th Cir. 1995) (en banc)). Accordingly, "Strickland offers a superior framework for addressing attorney conflicts outside the multiple or serial client context." Beets, 65 F.3d at 1265. "Strickland more appropriately gauges an attorney's conflict of interest that springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client." Id. at 1260. When a personal conflict of interest is alleged, the pertinent inquiry is whether Petitioner has demonstrated that his "attorney's performance fell below an objective standard of reasonableness and that it prejudiced the defense, undermining the reliability of the proceeding." Id. at 1272-73. The "presumed prejudice standard" does not extend beyond cases involving multiple representation. Id. at 1265.

Here, there is no evidence that trial counsel actively represented conflicting interests that adversely affected trial counsels' performance during the post-trial phase. The conflict of interest present in these circumstances is not the type of conflict to which Cuyler applies. Trial counsel spoke with the trial judge and the co-defendant's attorneys after the Petitioner's trial was completed, expressing their belief of the co-defendant's innocence. These discussions took place because trial counsel felt some moral imperative to do so, not because they were representing the co-defendant. Likewise, the disclosure of the unredacted timeline was inadvertent, and once trial counsel learned of its disclosure, they sought the document's return. Their conflict does not arise from conflicting representation but from trial counsels' necessary involvement in the co-defendant's case, including testifying as a witness, due to their inadvertent disclosure of the unredacted timeline. As the State aptly notes, trial counsel were not engaged in any

conflicting representation of another party. Accordingly, the presumed prejudice standard of Cuyler is inapplicable to the Petitioner's case.

The Petitioner also makes a Cronic claim on appeal. The post-conviction court addressed the issues as presented by counsel in the February 2017 amended petiton, and a violation of Cronic was not specifically raised therein. Thus, Cronic was not referenced by the post-conviction court in its ruling. Nonetheless, the Petitioner had previously alleged a violation of Cronic in his pro se filings, and a presumed prejudice argument was presented at the post-conviction hearing. At the conclusion of proof, the lawyers submitted the voluminous pleadings and filings to the post-conviction court without making any argument or clarifying the issues to be addressed. This only served to exacerbate the difficulty in assessing the specific legal arguments properly presented to the post-conviction court for adjudication. Also, the State does not raise the allegation of waiver on appeal. Because the Petitioner is a layperson, who cited to Cronic in his pro se filings, and given the various nuances of these three standards, we decline to waive the Petitioner's Cronic argument. To do so would only compound the injustice to the judicial process that is present in this case.

In addition, this court has previously reviewed a petitioner's claim under Cronic even though it was not presented to the post-conviction court. See Demario Lawon Fisher v. State, No. M2018-00131-CCA-R3-PC, 2019 WL 1504391, at *7 (Tenn. Crim. App. Apr. 5, 2019); Jay Dee Garrity v. State, No. M2016-01463-CCA-R3-PC, 2018 WL 1691296, at *9 (Tenn. Crim. App. Apr. 4, 2018); Marcus Nixon v. State, No. W2006-00618-CCA-R3-PC, 2007 WL 1215031, at *7 (Tenn. Crim. App. Apr. 20, 2007). But see Ricky Vales v. State, No. W2017-02361-CCA-R3-PC, 2019 WL 1109907, at *4 (Tenn. Crim. App. Mar. 11, 2019) (waiving a petitioner's allegation of presumed prejudice where the State argued for waiver, but proceeding to address the Cronic claim and finding it to be without merit). Moreover, the United States Supreme Court has held that "whether we require the defendant to show actual prejudice . . . or whether we instead presume prejudice turns on the magnitude of the deprivation of the right to effective assistance of counsel." Flores-Ortega, 528 U.S. at 482. "[G]iven that the existence of any of the scenarios in Cronic results in per se reversible error," we will address [the Petitioner's] claims. Garrity, 2018 WL 1691296, at *9.

Before addressing the merits of the Petitioner's Cronic claim, we must address the State's argument that the Cronic standard is inapplicable here. The State argues that the Petitioner "identifies no 'complete' abandonment of counsel entitling him to a presumption of prejudice" pursuant to Cronic. Citing to Wallace v. State, 121 S.W.3d 652 (Tenn. 2003), the State submits that "[i]n the motion for new trial context, the Cronic standard applies to a complete failure to file such a motion." The State continues,

-33-

But prejudice is only presumed from counsel's failure to file a motion when it waives all non-sufficiency issues on appeal. [Wallace, 121 S.W.3d] at 659. This was not the case here, as this [c]ourt found that only three of [the Petitioner's] [eighteen] appellate issues were waived for failure to litigate them in the motion for a new trial. See Matthews, 2008 WL 2662450, at *14, *17.

However, the State's reliance on Wallace is misplaced.

In Wallace, the petitioner's motion for new trial was untimely filed, and as a result of untimely filing, the petitioner did not receive appellate review of specific issues raised in the motion for new trial regarding alleged errors at trial. Our supreme court held in Wallace that prejudice was presumed under Cronic because "[c]ounsel's abandonment of his client at such a critical stage of the proceedings resulted in the failure to preserve and pursue the available post-trial remedies and the complete failure to subject the State to the adversarial appellate process." 121 S.W.3d at 658. In the instant case, we are not presented with a case such as Wallace, where the petitioner "was procedurally barred from pursuing issues on appeal, and the State's case was not subjected to adversarial scrutiny upon appeal." Id. at 660. Instead, we are faced with a scenario where trial counsel failed to act as an adversary and subject the Petitioner's motion for new trial proceedings to any meaningful adversarial testing.

Here, the Petitioner's motion for new trial was timely filed. However, the issues were skeletal in nature, without argument or citation to authority. The motion for new trial proceedings were not pursued for over seven years; meanwhile, trial counsel engaged in many unethical behaviors related specially to the Petitioner's representation. Once reinitiated, the amended motion again presented skeletal issues, raising only as new issues sufficiency of the evidence and the trial court's issuance of the instruction on criminal responsibility during jury deliberations. Thus, Wallace, and the injustice it seeks to prevent, is distinguishable from the injustice to the judicial process present here.

Turning to the merits of the Petitioner's Cronic claim, we reiterate the following facts and observe that more is at play here than trial counsels' conflict of interest alone. Trial counsel spoke with the trial judge and the co-defendant's attorneys after the Petitioner's trial was completed under what can only be classified as inauspicious circumstances. The meeting began at the courthouse, moved to a parking lot, and ended at the trial judge's home forty-five minutes away. During this conversation, trial counsel expressed their belief of the co-defendant's innocence. In so informing the trial judge, trial counsel disclosed privileged information based upon their investigation, whether outright or inferentially, to the trial judge. They in essence implied that the Petitioner was, in fact, guilty. The trial judge testified that he believed the meeting was to discuss fees and was not to talk about substantive matters. When substantive matters were

-34-

discussed, the trial judge promptly informed the State of the meeting. However, no one apparently ever informed the Petitioner of the meeting.

The circumstances surrounding the communication are troubling, to say the least. Trial counsel found the trial judge at work in the courtroom. Once court recessed for the day, trial counsel approached the trial judge and requested to speak with him. The trial judge advised trial counsel that he had plans for the evening and that any meeting would have to be quick. For whatever reason, trial counsel then agreed to follow the trial judge back to Clarksville and met in a parking lot. It is unclear why any short meeting about fees would need to be moved from the courthouse. Nonetheless, they apparently met in this parking lot but, due to logistics and the trial judge's well-founded discomfort with the setting, continued on to the trial judge's home. The trial judge's urgency to end the discussion for other plans seemingly dissipated. Once there, the meeting lasted roughly thirty minutes.

Trial counsel allowed the co-defendant's attorneys unsupervised access to the Petitioner's files and documents. Ms. Gore was able to obtain and copy the unredacted timeline, which contained statements made by the Petitioner that established his guilt and cruelty towards to the victims. Although trial counsel sought return of the document, the co-defendant's lawyers did not comply, and the unredacted timeline became a highly-litigated issue in the co-defendant's proceedings. Trial counsel obtained their own representation based upon the disclosure. Surely, when associate counsel was called to testify at the co-defendant's motion for new trial hearing in 2000, he was no longer conflict-free. When associate counsel withdrew in October 2000, he stated that lead counsel had returned from Cambodia and would be able to continue with the Petitioner's motion for new trial proceedings, now almost four years old. Lead counsel testified that he was unaware of any further obligations in the Petitioner's case despite the fact that he had never filed a formal motion to withdraw in the Petitioner's case. Even more perplexing is the trial court's decision to allow associate counsel to return to the Petitioner's case in 2003, at which time the conflict should have been apparent to all parties. Associate counsel acknowledged this precise conflict in his July 11, 2005 motion to withdraw from the Petitioner's case, and the trial court granted the motion.

Moreover, trial counsel failed to zealously represent their client by letting the case linger in the trial court for years without pursuing preparation of the transcript. This case languished in the trial court for over nine years before the motion for new trial was finally adjudicated in March 2005. Securing the transcript does not provide a valid reason for this delay; in fact, it appears that the co-defendant's lawyers had a copy of the Petitioner's trial transcript first. The trial judge testified that he got the "clear impression" from trial counsel that the Petitioner himself "was not sure if he wanted to proceed in a motion for new trial" because he did not want to be exposed to the death

-35-

penalty upon retrial. However, neither trial counsel nor the Petitioner confirmed the trial judge's assertion. We also question whether that was the state of the law at the time, given that the jury had already rejected a death sentence in this case. See Arizona v. Rumsey, 467 U.S. 203, 212 (1984) (holding that if a trial court has rejected death as a possible sentence, double jeopardy bars the state from seeking the death penalty at re-sentencing, even where rejection of the death sentence was based on a legal error).

Just as in State v. Davis, 466 S.W.3d 49, 79 (Tenn. 2015) (Lee, J., concurring), "this case illustrates the danger of allowing a case to lay dormant while the wheels of justice grind to a halt." With the passage of time, memories fade and witnesses become intimidated, move, pass away, or simply want to forget the events they witnessed. Davis, 466 S.W.3d at 79. The law changes and evolves, as it has in this case, making identification of the proper principles to apply even more difficult. Timely adjudication of criminal charges is a right guaranteed by the United States Constitution. Id. Trial judges should manage their dockets in a timely manner, and defense lawyers and prosecutors should take reasonable efforts to expedite litigation. Id. The timely resolution of criminal cases is a foundational principle of our criminal justice system and is essential to the pursuit of justice. Id.

Here, trial counsel entirely failed to subject the prosecution's case to meaningful adversarial testing in the post-trial phase, and there has been a denial of the Petitioner's Sixth Amendment rights that makes the adversary process itself presumptively unreliable. See Cronic, 466 U.S. at 659. In addition to the inexcusable delay in the Petitioner's motion for new trial proceedings and the trial judge's and trial counsels' unethical behavior, trial counsel only filed a skeletal motion for new trial and amended motion for new trial. The amended motion for new trial, that took over seven years to file, raised only two additional issues. All issues were presented in cursory fashion without argument or citation to legal authority. Moreover, from the testimony at the post-conviction hearing, it appears trial counsel waived a hearing on the motion for new trial without providing evidence of the Petitioner's consent. The Petitioner's waiver only covered his presence at the motion for new trial hearing. Trial counsels' deficiencies in this case are egregious. We conclude that there has been a complete breakdown in the adversarial process. We cannot speculate about what issues might have been raised in the Petitioner's motion for new trial had he had the effective assistance of conflict-free counsel.

Because the presumed prejudice standard of Cronic applies, we hold that the Petitioner is entitled to relief. However, the Petitioner's convictions remain intact. Trial counsels' deficiencies occurred post-trial. Upon remand, the Petitioner is permitted a delayed motion for a new trial and conflict-free counsel during the motion for new trial

phase.[13]  Thereafter, any appeal shall proceed in accordance with the Rules of Appellate Procedure.

## II. Trial Judge's Competency[14]

Next, the Petitioner alleges that the post-conviction court erred by concluding that his due process rights "to an impartial [j]udge/competent [thirteenth] juror were not violated." According to the Petitioner, the post-conviction court misconstrued the issue. He states that his argument in the post-conviction court was not that the trial judge's "exposure to outside privileged information in and itself violated his due process rights to an impartial [j]udge." He submits, instead, that his argument, properly construed, was as follows:

> [H]is due process rights were violated because [the trial judge], after having been exposed to the extrajudicial privileged information, became immediately aware that an actual and significant conflict of interest existed between [the Petitioner] and his trial counsel, yet the [trial judge] knowingly disregarded, and intentionally refused to comply with, his judicial duty to inquire into and remedy the conflict of interest.

(Emphasis removed). He argues that the trial judge's failure to inquire into this conflict of interest disqualified the trial judge from ruling on the motion for new trial or rendering a thirteenth juror determination. Seemingly contrary to his position above, the Petitioner then notes that the trial judge "was objectively influenced by the extrajudicial information he received[,]" as reflected by the trial judge's thirteenth juror determination. According to the Petitioner, this provided evidence of the trial judge's bias against him and requires reversal for a successor judge to render a thirteenth juror determination.

As a separate issue, the Petitioner argues that trial counsel was ineffective by failing to seek recusal of the trial judge. The Petitioner asserts that trial counsels' ineffectiveness "was based upon their underlying conflict." According to the Petitioner, he has demonstrated that there was an actual conflict that adversely affected his trial counsel's performance. Again, he argues for a presumed prejudice standard.

In the post-conviction court, the Petitioner, through counsel, framed these issues in his amended petition as follows: (1) competency of the trial judge to sit as thirteenth juror due to his exposure to ex parte information provided by trial counsel; and (2) appellate

---

[13] As discussed below, the trial judge's approval of the verdict as thirteenth juror can stand.

[14] In the event of further appellate review, we will address all of the Petitioner's issues, so that they not be pretermitted. See State v. Parris, 236 S.W.3d 173, 189 (Tenn. Crim. App. 2007) (following a similar procedure).

-37-

counsel's failure to argue the thirteenth juror issue on appeal. In the amended petition, it is specifically stated, "ex parte information received by the judge after the trial, but before the [m]otion for [n]ew [t]rial was ruled upon, should have rendered the trial judge unable to continue to hear the case, such that he would have been unable to rule upon any further matters in the case." The petition went on to state that the trial judge should have recused himself because his impartiality could have reasonably been questioned and that his attorneys were ineffective for failing to seek recusal of the trial judge based upon the trial judge's knowledge of disputed facts. According to the petition, the Petitioner's right to a fair and impartial tribunal was violated, which is a structural error that requires automatic reversal. It was also noted therein that when a trial court becomes aware of a potential conflict of interest, it is obligated to pursue the matter even if counsel does not. Therefore, the trial judge, knowing of the breach, should have removed trial counsel. The presumption of prejudice was again cited, and a new trial was requested.

The post-conviction court, in issuing its ruling, first observed that "[t]he ex parte meeting between trial counsel and [the trial judge] is particularly troubling when considering issues of appearance of impropriety and public confidence in the judiciary." The post-conviction court indicated that "the ex parte meeting between . . . trial counsel and the trial judge was far from wise." The post-conviction court continued,

> While not discounting any moral or emotional distress [trial counsel] may have been experiencing, counsels['] "baring their souls" to the trial judge who was still faced with presiding over both [the co-defendant's] trial and [the Petitioner's] motion for new trial could have had no practical effect upon the proceedings in the Taco Bell case. At the very least, [the trial judge] could have done nothing in either defendant's case with the information, and at worst the disclosure ran the risk of impermissibly prejudicing the trial judge against the co-defendants—the very issue [the Petitioner] now raises in this case. Perhaps most disconcerting are trial counsels['] admissions they did not consider the impact on [the Petitioner's] case in making their disclosures to [the trial judge] and counsels['] failure to notify [the Petitioner] about their meeting with the judge. Finally, the meeting was not excepted from the no-ex-parte communications rule and, therefore, likely violated the ethical rules established in the Code of Judicial Conduct.

These observations are on point.

In determining that the Petitioner had not shown ineffective assistance in this regard, the post-conviction court focused on prejudice. The post-conviction court reasoned,

-38-

Clearly, [the trial judge] was exposed to information beyond the confines of [the Petitioner's] trial implicating the [P]etitioner in these offenses. However, the judge's order denying the motion for new trial does not reference the ex parte conversation with trial counsel or the evidence produced at [the co-defendant's] trial and motion for new trial hearing, and at the post-conviction hearing [the trial judge] testified he was not affected by the information he learned outside [the Petitioner's] trial in ruling on the [Petitioner's] motion for new trial. Furthermore, the [c]ourt notes the trial judge's meeting with counsel was not an active fact-finding exercise, and there was no prejudice inherent in the trial judge's learning about the [Petitioner's] timeline in the course of his judicial duties in the [the co-defendant's] case.[15] In the absence of evidence to the contrary, the [c]ourt must conclude the trial court was not prejudiced against [the Petitioner] based on the trial court's exposure to information outside of trial. Thus, the [P]etitioner's assertion the trial judge was incompetent to serve as thirteenth juror is without merit.

The post-conviction court then addressed the allegation of ineffective assistance of counsel for failing to seek recusal of the trial judge. The post-conviction court again determined that the Petitioner had failed to establish prejudice:

Even if [trial counsel] had raised the issue and had convinced [the trial judge] to recuse himself from the new trial proceedings, . . . a successor judge would have been eligible to serve as thirteenth juror and rule on the motion for new trial. . . . [T]his [c]ourt is confident a successor judge would have been able to conclude the [P]etitioner's convictions were not contrary to the weight and sufficiency of the evidence. Counsel therefore did not render ineffective assistance as to this issue.

Litigants in Tennessee have a fundamental right to a "fair trial before an impartial tribunal." State v. Austin, 87 S.W.3d 447, 470 (Tenn. 2002). Tennessee Supreme Court Rule 10, Code of Judicial Conduct, Canon 2.11,[16] states that "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned," including when the "judge has . . . personal knowledge of facts that are in dispute in the proceeding" or when "[t]he judge knows that the judge . . . is likely to be a material witness in the proceeding." "[P]ersonal knowledge" pursuant to this provision has been defined by our supreme court: (1) "as knowledge that arises out of a judge's private, individual connection to particular facts and not including information that a

---

[15] We note that the Petitioner does not specifically reference the timeline in his appellate brief.

[16] The numbering of these Rules has changed since the incidents at issue, but the substance has not. Accordingly, we will cite to the current Rules.

judge learns in the course of her general judicial capacity or as a result of her day-to-day life as a citizen"; or (2) "as that which a judge obtains as a witness to the transaction or occurrence not in their judicial capacity." Holsclaw v. Ivy Hall Nursing Home, Inc., 530 S.W.3d 65, 69-70 (Tenn. 2017) (citing State v. Dorsey, 701 N.W.2d 238, 247 (Minn. 2005); United States v. Long, 88 F.R.D. 701, 702 (W.D. Pa. 1981), aff'd, 676 F.2d 688 (3d Cir. 1982). In addition, our supreme court has interpreted this provision to require a judge to disqualify himself or herself in any proceeding in which "a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality." Id. at 69 (quoting State v. Cannon, 254 S.W.3d 287, 307 (Tenn. 2008)). "[T]he test for recusal is an objective one because the appearance of bias is just as injurious to the integrity of the courts as actual bias." Id.

Also, communications with a judge outside the presence of both parties are generally prohibited by the Code of Judicial Conduct. Canon 2.9(A) states that "[a] judge shall not initiate, permit, or consider ex parte communications or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending or impending matter." Tenn. Sup. Ct. R. 10, Canon 2.9(A) (describing certain exceptions, such as scheduling or administrative issues). Comment 3 under this provision provides clarification that the communications may not be with any "other persons who are not participants in the proceeding," with a few exceptions. Tenn. Sup. Ct. R. 10, Canon 2.9, Cmt. 3. Comment 1 to Canon 2.9 explains, "To the extent reasonably possible, all parties or their lawyers shall be included in communications with a judge." If, however, "a judge receives an unauthorized ex parte communication bearing upon the substance of a matter," then "the judge shall make provision promptly to notify the parties of the substance of the communication and provide the parties with an opportunity to respond." Tenn. Sup. Ct. R. 10, Canon 2.9(B).

As noted above, the trial judge testified that he believed the meeting was to discuss fees and was not to talk about substantive matters. When substantive matters were discussed, the trial judge promptly informed the State of the meeting as required by the Rule. As far as the judge's role in the communication, it is not necessarily the communication itself, but the circumstances surrounding the communication that are problematic. However, the trial judge did not recuse himself in this case despite the ex parte communication and the circumstances surrounding that communication.

Some errors "compromise the integrity of the judicial process itself" by "involv[ing] defects in the trial mechanism." State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008). These errors are known as structural constitutional errors and they "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no [such]

criminal punishment may be regarded as fundamentally fair.'" Id. (alterations in original) (quoting Momon v. State, 18 S.W.3d 152, 165 (Tenn. 1999) (quoting Neder v. United States, 527 U.S. 1, 8-9 (1999))). Examples of structural constitutional errors include a biased trial judge, racial discrimination in the selection of a grand jury, the complete denial of counsel, the denial of a public trial, a defective reasonable-doubt instruction, and the denial of self-representation at trial. See Washington v. Recuenco, 548 U.S. 212, 218 n.2 (2006). These errors "are not amenable to harmless error review, and therefore, they require automatic reversal when they occur." Rodriguez, 254 S.W.3d at 371.

In State v. Letalvis Cobbins, LeMaricus Davidson, and George Thomas, No. E2012-00448-SC-R10-DD, slip op. at 3 (Tenn. May 24, 2012) (order), our supreme court held that a trial judge's out-of-court misconduct, in that case his addiction to opiate painkillers, did not constitute structural error "when there is no showing or indication in the record that the trial judge's misconduct affected the trial proceedings." While noting that the trial judge's actions in that case were "a clear and palpable violation" of the canons of judicial conduct, the supreme court, "in the absence of controlling authority otherwise," declined "to hold that a trial judge's out-of-court misconduct, by itself, constitutes structural error unless there is proof that the misconduct affected the trial proceedings." Id. at 4; see also State v. Leath, 461 S.W.3d 73, 116 (Tenn. Crim. App. 2013).

"[M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." Bracy v. Gramley, 520 U.S. 899, 904 (1997). Rather, these questions are "answered by common law, statute, or the professional standards of the bench and bar." Id. The floor established by the Due Process Clause simply "requires a 'fair trial in a fair tribunal,' before a judge with no actual bias against the defendant or interest in the outcome of his particular case." Id. at 904-05 (emphasis added). A trial judge's misconduct amounts to a structural constitutional error when the misconduct affects the judge's impartiality. Put another way, a trial judge's misconduct constitutes a structural error when that "conduct pierces the veil of judicial impartiality." People v. Stevens, 869 N.W.2d 233, 242 (Mich. 2015).

While we do not condone the trial judge's behavior, we are nonetheless constrained to agree with the post-conviction court that the Petitioner has not demonstrated how he was prejudiced by the trial judge's failure to recuse himself from the Petitioner's case. The ex parte meeting occurred after the Petitioner was convicted, so it did not influence the trial. Furthermore, the motion for new trial order does not reference the ex parte conversation or the evidence adduced at the co-defendant's trial. The trial judge learned the same type of information during the ex parte communication

as he did while presiding over the co-defendant's motion for new trial hearing and viewing the unredacted timeline.

In this regard, the post-conviction court made the following pertinent observations:

[T]he Tennessee Supreme Court has observed "[a] trial judge is not disqualified because that judge has previously presided over legal proceedings involving the same defendant." State v. Reid, 213 S.W.3d 792, 815 (Tenn. 2006). Additionally, "Prior knowledge of the facts about the case is not sufficient in and of itself to require disqualification." Alley [v. State], 882 S.W.2d [810,] 822 [(Tenn. Crim. App. 1994)]. The same judge who presided over a defendant's trial usually presides over the same defendant's post-conviction proceedings despite the judge's prior exposure to the facts of the case because "to require recusal whenever a trial judge in a post-conviction proceeding has knowledge of disputed facts would wreak havoc in the criminal justice system." Harris v. State, 947 S.W.2d 156, 173 (Tenn. Crim. App. 1996). In short, issues regarding a trial judge's exposure to potentially disputed facts during judicial proceedings in either the same defendant's case or those of a codefendant can be summarized thusly: "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality [disqualification] unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." Liteky v. United States, 510 U.S. 540, 555 (1994).

Finally, the [c]ourt finds the following comments from the First Circuit Court of Appeals particularly relevant in addressing these issues:

Insofar as the judge's presiding over the prior trials of [a defendant's] co-defendant[] may have resulted in his learning about facts damaging to [the particular defendant], the situation is not much different from when a presiding judge learns about evidence, later excluded, damaging to a defendant at a voir dire or bench conference in the same proceeding. While judges attempt to shield themselves from needless exposure to matters outside the record, they are necessarily exposed to them in the course of ruling on the admission of evidence; and the judicial system could not function if judges could deal but once in their lifetime with a given defendant, or had to withdraw from a case whenever they had presided in a related or companion case or in a

-42-

separate trial in the same case. The mere fact, therefore, that a judge has already presided over the separate jury trials of codefendants does not, in our view, constitute reasonable grounds for questioning his impartiality in a subsequent jury trial involving a remaining co-defendant.

[U.S. v. Cowden, 545 F.2d [257,] 265-66 [(1st Cir. 1976)] . . . . Or, as a former Chief Justice once observed, "trial judges often have access to inadmissible and highly prejudicial information and are presumed to be able to discount or disregard it." Gentile v. State Bar of Nevada, 501 U.S. 1030, 1077 (1991) (Rehnquist, C.J., dissenting).

We agree with these well-reasoned findings.

In addition, most of the motion for new trial issues were reviewed on direct appeal and found to be without merit. The trial judge testified at the post-conviction hearing that he was not influenced by trial counsels' statement regarding the co-defendant's innocence, indicating that he may not have believed trial counsels' statements and maintaining that the evidence in the Petitioner's case "was beyond any and all reasonable doubt[.]" According to the trial judge, trial counsels' statement concerning the co-defendant's innocence did not "affect [him] at all in terms of [his] judgment on the sufficiency of the evidence that was [ad]duced at the trial." We cannot say that any bias or impartiality affected the trial judge's ruling on the Petitioner's motion for new trial. The Petitioner has failed to show any resultant prejudice from the trial judge's failure to recuse himself. See, e.g, Carlos Cornwell v. State, No. E2016-00236-CCA-R3-PC, 2017 WL 5957667, at * (Tenn. Crim. App. Dec. 1, 2017).

The Petitioner's assertion the trial judge was incompetent to serve as thirteenth juror is likewise without merit. Nothing in the record reflects that the trial judge was improperly influenced in his decision as thirteenth juror in the Petitioner's case from information he received during the ex parte communication with trial counsel or by presiding at the co-defendant's trial. See, e.g., State v. Stacey Dewayne Ramsey, No. 01C01-9412-CC-00408, 1998 WL 255576, at *14 (Tenn. Crim. App. May 19, 1998) (holding that the trial judge properly denied the defendant's motion to recuse, because although the trial judge heard similar testimony during the co-defendant's trial and approved the verdict of guilt against the co-defendant, the record did not reflect that the judge was influenced in his decision as a thirteenth juror in the defendant's case by his presiding at the co-defendant's trial). For these same reasons, because the Petitioner has failed to establish prejudice from the trial judge's failure to recuse himself, we hold that the Petitioner has not proven that trial counsel were ineffective when they did not move for trial judge's recusal. See, e.g., Jimmy Heard v. State, No. M2013-02661-CCA-R3-PC, 2015 WL 4773348, at *6 (Tenn. Crim. App. May 19, 2015) (concluding that a

-43-

motion to recuse would have been unsuccessful and, therefore, trial counsel could not be found to have performed ineffectively).

The Petitioner also argues that the trial judge's failure to inquire into trial counsels' alleged conflict of interest required recusal and violated his due process rights. Courts have an independent duty to ensure that all proceedings are conducted within the ethical standards of the profession and are "fair to all who observe." Wheat v. United States, 486 U.S. 153, 160, (1988). When, therefore, the trial court is aware or should be aware of a conflict of interest, there must be an inquiry as to its nature and appropriate measures taken. Frazier v. State, 303 S.W.3d 674, 683 (Tenn. 2010) (citing Cuyler, 446 U.S. at 346-47). Otherwise, prejudice will be presumed. Id. (citing Cuyler, 446 U.S. at 349-50). The Petitioner provides us with no authority, and we know of none, that requires a trial judge to recuse himself due to his failure to inquire into a conflict of interest. Such a scenario presents an unworkable "Catch-22." Moreover, Frazier is distinguishable from this case because Frazier dealt with a direct rather than imputed conflict. See Christopher Locke v. State, No. E2015-02027-CCA-R3-PC, 2017 WL 1416864, at *7 (Tenn. Crim. App. Apr. 19, 2017). These issues do not merit the Petitioner relief.

Briefly, we digress to discuss whether the trial judge's thirteenth juror determination can stand or whether the successor judge must make such a determination during the motion for new trial proceedings upon remand. Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This is the modern equivalent of the thirteenth juror rule and "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Biggs, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (internal quotation marks omitted) (quoting State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995)).

It is only when "the record contains statements by the trial judge expressing dissatisfaction with the weight of the evidence of the jury's verdict, or [evidence] indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, [that] an appellate court may reverse the trial court's judgment" on the basis that the trial court failed to carry out its duty as the thirteenth juror. Carter, 896 S.W.2d at 122. "[T]he accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

Here, the trial judge denied the Petitioner's motion for new trial and ruled that the evidence was sufficient to support the Petitioner's convictions. See Biggs, 218 S.W.3d at 653 (providing that we "may presume the trial court approved the verdict as the thirteenth

juror" when it has overruled a motion for new trial without comment). While we do not condone the trial judge's behavior in this case, our reversal is due to the failures of trial counsel and is not based upon the actions or rulings of the trial judge. For these reasons, we believe that the trial court's approval of the verdict as thirteenth juror can stand and that there is no need for the successor judge to examine this finding.

### III. Lesser-Included Offense Instructions

The Petitioner raises numerous issues with the jury instructions. Many of these issues have multiple subsections. We discern that the Petitioner's overarching concern is that trial counsel were ineffective for failing to request lesser-included offense instructions, as well as an instruction on facilitation.

At the time these offenses were committed, the offense of felony murder constituted "[a] reckless killing of another" in the perpetration of certain offenses—in this case, robbery. Tenn. Code Ann. § 39-13-202(a)(2). The record reflects that the trial court did not charge any lesser-included offenses for felony murder. We note that the record contains no filings by trial counsel as to proposed lesser-included offenses, nor is there any discussion on this issue in the trial transcript.

Because our inquiry involves evaluating trial counsels' performance at the time of the trial and the motion for new trial, we will evaluate their decisions under the law of lesser-included offenses as it existed at the time of trial counsels' actions or inactions. See Wiley v. State, 183 S.W.3d 317, 326 (Tenn. 2006) (evaluating a petitioner's post-conviction claim of ineffective assistance of counsel in failing to request lesser-included offense instructions by reviewing counsel's actions in light of the law of lesser-included offenses as it existed at the time of the trial). The relevant law at the time of the Petitioner's trial provided, "It is the duty of all judges charging juries in cases of criminal prosecutions for any felony wherein two (2) or more grades or classes of offenses may be included in the indictment, to charge the jury as to all of the law of each offense included in the indictment, without any request on the part of the defendant to do so." Tenn. Code Ann. § 40-18-110(a). In other words, "section 40-18-110(a) require[d] trial judges to charge the jury on lesser-included offenses charged in the indictment whether requested to do so or not." State v. Lewis, 919 S.W.2d 62, 68 (Tenn. Crim. App. 1995) (citing Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979)). Furthermore, our supreme court had held that a defendant was entitled to jury instructions on all lesser-included offenses and on all lesser grades or classes of the offense charged if the evidence would support a conviction for the offense. State v. Trusty, 919 S.W.2d 305, 311 (Tenn. 1996).[17]

---

[17] Trusty was decided by our supreme court in March of 1996, a little less than three months before the Petitioner's trial began.

At the time of the Petitioner's trial, second degree murder required a knowing killing of another. Tenn. Code Ann. § 39-13-201 (1990). In Wiley, 183 S.W.3d at 326, our supreme court noted that the "the trial court failed to instruct the jury on second degree murder even though it was required to do so under Trusty." Additionally, reckless homicide and criminally negligent homicide were clearly lesser-included offenses at the time of the Petitioner's trial. See State v. Gilliam, 901 S.W.2d 385, 390-91 (Tenn. Crim. App. 1995). Also, before the Petitioner's trial began, this court had determined that "virtually every time one is charged with a felony by way of criminal responsibility for the conduct of another, facilitation of the felony would be a lesser-included offense." Lewis, 919 S.W.2d at 67. The trial court's instructions in this case included the contested supplemental criminal responsibility instruction. Finally, the court in Lewis also explicitly concluded the offense of facilitation of felony murder existed. Id.

We agree with the post-conviction court that the trial court should have instructed the jury on these lesser-included offenses.[18] However, this does not end our inquiry. Neither lead nor associate counsel were asked at the post-conviction hearing about their collective failure to request these lesser-included offense instructions. According to associate counsel, the Petitioner's defense theory included the involvement of "other people['s] being inside the Taco Bell restaurant." The defense implied that the co-defendant was in fact the shooter. During closing arguments, lead counsel maintained that law enforcement assumed the Petitioner was involved and made the evidence "fit" him. He averred that the State's witnesses were unreliable. He indicated that the co-defendant was at the party where the Petitioner supposedly discussed the robbery and suggested that the co-defendant planted the shotgun in the Petitioner's backyard. Possibly, trial counsel were envisioning an "all or nothing" scenario with the jury instructions, but they were not asked why they did not request any lesser-included-offense instructions. It is the Petitioner's obligation to prove his factual allegations by clear and convincing evidence. Accordingly, the Petitioner has failed to carry his burden of proving that counsel was deficient in failing to request these lesser-included instructions. See, e.g., William Edward Watkins v. State, No. M2008-02098-CCA-R3-PC, 2010 WL 4812762, at *8 (Tenn. Crim. App. Nov. 23, 2010) (finding that the petitioner had failed to carry his burden of proving that trial counsel was deficient for omitting the second degree murder instruction issue in the motion for new trial because there was no direct proof at the post-conviction hearing about why trial counsel did not include the issue).

---

[18] The post-conviction court also found voluntary manslaughter to be a lesser-included offense of felony murder at the time of the Petitioner's trial. However, there is no evidence that the Petitioner was adequately provoked to support such an instruction.

Furthermore, whether a petitioner has suffered prejudice resulting from his counsel's failure to advocate proper jury instructions depends on "whether a reasonable probability exists that a properly instructed jury would have convicted the petitioner of the lesser-included offense instead of the charged offense." Moore v. State, 485 S.W.3d 411, 420-21 (Tenn. 2016) (citing Pylant, 263 S.W.3d at 869). This analysis "mirrors" the constitutional harmless error standard that would be applied had the issue been raised on direct appeal. Id. at 421.

The Tennessee Supreme Court in Moore clarified that the prejudice analysis in an allegation of error based on a failure to charge lesser-included offenses is dependent on a determination regarding whether any intervening or intermediate lesser-included offenses were charged to the jury. Moore, 485 S.W.3d at 421. When there is no intervening lesser-included offense charged, the situation we are faced with in the Petitioner's case, the reviewing court must consider the record, the evidence presented at trial, the defendant's theory, and the jury's verdict. Id. at 422 (citing State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002)). "In examining the evidence presented at trial, the harmless error analysis focuses on the distinguishing element between the greater and lesser offenses, the strength of the evidence, and the existence of contradicting evidence of the distinguishing element." Id. (citing Allen, 69 S.W.3d at 191). If the court determines that there is no reasonable probability that a properly instructed jury would have convicted on the lesser-included offenses, then the petitioner is not entitled to relief. Id. at 423-24 (concluding that overwhelming evidence supported the distinguishing element between the greater and lesser offenses).

As stated earlier, felony murder at the time the Petitioner committed the offenses was a "reckless killing of another" committed in the perpetration of certain offenses—in this case, robbery. Similarly, reckless homicide was a "reckless killing of another." Tenn. Code Ann. § 39-13-215. However, second degree murder, which was a "knowing" killing of another, was the directly intervening lesser-included offense of felony murder. Second degree murder has a greater mens rea than the greater offense of felony murder. If the proof supported the mens rea of knowing then it necessarily included the mens rea of reckless. Accordingly, the distinguishing element at issue for both second degree murder and reckless homicide was whether the killings occurred during the perpetration or attempt to perpetrate the especially aggravated robbery. The jury also found the Petitioner guilty of the especially aggravated robbery, and there was no proof to suggest that the killings happened independently of the robbery. Furthermore, the proof established that each victim was shot multiple times, including three who died from shots to the head and two who suffered close-range shots. No reasonable juror would have concluded that the Petitioner acted only negligently. So, we can confidently say the Petitioner was not prejudiced by the failure to seek instructions on second degree murder, reckless homicide, or criminally negligent homicide.

Nonetheless, as the court in <u>Moore</u> noted, 485 S.W.3d at 421 n.4, the term "immediately lesser offense" does not encompass inchoate offenses such as facilitation; however, facilitation is in fact a lesser-included offense of felony murder. At the time of the Petitioner's trial, facilitation was defined as follows: "A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). Criminal responsibility, as relevant here, was defined as,

> A person is criminally responsible for an offense committed by the conduct of another if:
>
> . . . .
>
> Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids or attempts to aid another person to commit the offense[.]

Tenn. Code Ann. § 39-11-402(2). Accordingly, the distinguishing element was whether the Petitioner provided substantial assistance in the commission of these crimes without having the intent to promote or assist in their commission or to benefit from the proceeds of the offenses.

On direct appeal to this court, the Petitioner contended "that the evidence was insufficient to establish that he was criminally responsible for the actions of [the co-defendant] and insufficient to establish that [the co-defendant] had the intent to rob the Taco Bell." <u>Mathews</u>, 2008 WL 2662450, at *16. This court concluded that the record "was more than sufficient" to support the Petitioner's convictions for felony murder under either a theory of direct liability or criminal responsibility. <u>Id.</u> (citing <u>State v. Lemacks</u>, 996 S.W.2d 166, 171 (Tenn. 1999). In so concluding, this court cited to the following evidence:

> Both Carl and Shawntea Ward testified that the [Petitioner] knew details of the Taco Bell murder otherwise known only to law enforcement officers, including the manner in which the perpetrator had entered and exited the restaurant, where the victims' bodies were located, how many shots had been fired, and the type of weapons used. Mr. Ward and Mr. Cooper saw the [Petitioner] load the shotgun and nine millimeter handgun before wiping his fingerprints from the weapons and placing them into a black book bag. During that time, the defendant wore white surgical

-48-

gloves. The [Petitioner] also donned black clothing over a Miami Hurricanes sweat suit and told them that they would "never see" the black clothing again. Just a day prior to the murders, the defendant asked Mr. Peghee to allow him to examine the safe in the Ft. Campbell mail room and specifically asked Mr. Peghee if one could access the safe by shooting the dial with a shotgun. On that same day, the [Petitioner] asked Ms. Underwood if exiting the rear door of the Taco Bell would activate an alarm. The [Petitioner's] jacket was found on the bank of the Red River a short distance from the Taco Bell. Stains on the jacket tested positive as the blood of Mr. Campbell, and black plastic fragments found in the pocket matched black fragments from the dial of the safe in the Taco Bell. Nine millimeter cartridge casings found at the scene and bullets recovered from the bodies of Mr. Campbell and Ms. Klopp matched casings and bullets found in the [Petitioner's] residence. Shotgun shells recovered from the scene matched those found at the [Petitioner's] residence and bore the same mechanism marks as the shotgun recovered from the [Petitioner's] residence. A bowling ball bag found in the [Petitioner's] car contained $2576 hidden under a bottom panel. Finally, the [Petitioner's] fingerprints were found on the door facing and ceiling vent cover in the men's restroom of the Taco Bell.

Id.

As noted above, the Petitioner maintained at trial that he was not involved in the robbery or killings. Trial counsel instead attempted to shift the blame to someone else, specifically the co-defendant. The Petitioner did not present any evidence at trial that he merely facilitated these crimes, and in fact, lead counsel objected to the State's asking a witness to define criminal responsibility and arguing any theory of guilt based on the co-defendant's involvement. Moreover, the co-defendant was also convicted of these crimes; the prosecution's theory in his trial being that he served as a "lookout" for the Petitioner. See Housler, 193 S.W.3d 484, 492-93. Finally, there was "overwhelming evidence of the [Petitioner's] participation in the crimes." Mathews, 2008 WL 2662450, at *16.

We agree with the post-conviction court that there is no reasonable probability that a properly instructed jury would have convicted on the lesser-included offenses. The trial court's failure to instruct on lesser-included offenses was, in short, harmless error. Therefore, the Petitioner did not suffer prejudice from trial counsel's failure to pursue lesser-included offense instructions. See, e.g., Eddie Medlock v. State, No. W2015-02130-CCA-R3-PC, 2016 WL 6135517, at *11 (Tenn. Crim. App. Oct. 21, 2016) (concluding that the petitioner had failed to establish prejudice from trial counsel's failure

-49-

to request or appeal the jury instructions regarding lesser-included offenses because there was no reasonable probability that a properly instructed jury would have convicted the petitioner on any lesser-included offenses).

IV. Absences from Courtroom

The Petitioner first submits that the preponderance of the evidence establishes that he was absent during the supplemental jury instruction on criminal responsibility and when the trial court answered two questions from the jury. The Petitioner then contends that absent his presence, the trial court's supplemental instruction and answer to the jury's question violated his constitutional right to be present for trial and constituted structural error. He also argues trial counsel's failure to object to his absence on these two occasions constituted reversible error.

Regarding the supplemental instruction, the record reflects that while the jury was deliberating, the trial court recalled the jury into the courtroom to instruct the jury on criminal responsibility for the conduct of another—an instruction which the trial court stated it had "inadvertently omitted" and upon which the jury was "not to place undue emphasis." The record does not indicate whether the Petitioner was present in the courtroom for this instruction. At the post-conviction hearing, both the Petitioner and two of his relatives testified he was not present during the supplemental instruction. Associate counsel and the trial judge could not recall whether the Petitioner was present, though they both stated that their customary practice would have been to secure the Petitioner's presence. Lead counsel was in fact absent himself when the trial judge issued the instruction; however, he recalled that when he returned he lodged an objection to the instruction and that the Petitioner was present at that time. In addition, appellate counsel testified that he spoke with the Petitioner about which issues to raise on appeal, and though they raised an issue about the trial court's giving of the supplemental instruction, they did not raise any issue about the Petitioner's absence from the courtroom during portions of the trial proceedings. Finally, the prosecutor testified that he was present for every portion of the Petitioner's trial and that the Petitioner was always there.

The Petitioner also argues his right to be present was violated when the court answered jury questions outside his presence. The post-conviction court summarized the following facts pertaining to this specific instance:

> The record reflects on Saturday, [June] 22, 1996, the jury submitted two questions: "Would you clarify Supplemental Instruction Number 2?" and "Would you clarify all of count Five?" The trial court's opening comments to the attorneys suggests the court had, off the record, received the jury questions, discussed the question with counsel, and crafted a

proposed response to the questions before addressing them in court. Once court resumed, the trial court provided the following response to the jury:

It is the [c]ourt's duty to instruct as to the applicable law. It is the jury's duty to determine the law's application to the facts as you determine them to be. Neither the [c]ourt nor anyone else may invade the province of the jury in this regard. Any further explanation regarding Supplemental Instruction Number Two and Count Five of the indictment would thus be inappropriate.

The Petitioner testified that he was absent when the trial judge answered the jury's questions. Again, the prosecutor testified that he was present for every portion of the Petitioner's trial and that the Petitioner was always there.

The post-conviction court determined that the Petitioner had the right to be present on both occasions, during the supplemental instruction on criminal responsibility and the trial court's answering of the jury's questions. However, the post-conviction court declined to resolve the dispute on whether the Petitioner was or was not present on these occasions. Instead, the post-conviction court focused on whether the Petitioner suffered prejudice from his alleged absences. Because both parties have made much ado about the post-conviction's court decision not to address whether the Petitioner was in fact absent on these occasions, we again note that "a petitioner must establish both prongs of the test" and that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697). "Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component." Id. Accordingly, the post-conviction court was not mandated to resolve the dispute. We will turn to our analysis of whether the record supports the post-conviction court's determination that the Petitioner was not prejudiced by his alleged absences on these two occasions.

A defendant has a fundamental right under both the federal and state constitutions to be present during his trial. State v. Muse, 967 S.W.2d 764, 766 (Tenn. 1998) (citing U.S. Const. amends. V, VI, XIV; Tenn. Const. art. I, § 9). "Presence at 'trial' means that the defendant must be 'present in court from the beginning of the impaneling of the jury until the reception of the verdict and the discharge of the jury.'" Id. (quoting Logan v. State, 173 S.W. 443, 444 (Tenn. 1914)).

Rule 43(a) of the Tennessee Rules of Criminal Procedure also gives a defendant the right to be present at trial:

(a) Presence Required. Unless excused by the court upon defendant's motion, the defendant shall be present at the arraignment, at every stage of the trial including impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

Tenn. R. Crim. P. 43(a); see also Crosby v. United States, 506 U.S. 255, 262 (1993) (interpreting Federal Rule of Criminal Procedure 43, which is similar to our state's rule, as prohibiting the trial in absentia of a defendant who is not present at the beginning of trial). The scope of this rule is broader than the constitutional right alone because the rule "embodies the protections afforded by the Confrontation Clause of the Sixth Amendment, the right to be present derived from the Due Process Clause[s] of the Fifth and Fourteenth Amendments, and the common law privilege of presence." Muse, 967 S.W.2d at 767. "For example, under the Confrontation Clause, a defendant has the right to be present in order to confront witnesses and evidence against him." Matthew L. Moates v. State, No. E2003-01926-CCA-R3-PC, 2004 WL 1196085, at *9 (Tenn. Crim. App. May 27, 2004) (citing United States v. Gagnon, 470 U.S. 522, 526 (1985)). Pursuant to due process, "a defendant has a right to be present 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" Id. (quoting Gagnon, 470 U.S. at 527) (additional internal quotations and citations omitted).

The Petitioner asserts the trial court's giving the supplemental instruction on criminal responsibility and responding to the jury's questions without the Petitioner's being present was a structural constitutional error requiring a new trial. We disagree.

The Petitioner, in support of his argument that automatic reversal is required, focuses on the Muse opinion, which held that the defendant's absence from the entire jury selection process required reversal, 967 S.W.2d at 768, as well as citing to Witt v. State, 45 Tenn. (5 Cold.) 11 (1867), an 1867 opinion of the Tennessee Supreme Court. In Witt, the court reversed a conviction based upon the trial court's rereading a portion of the original jury charge outside the defendant's presence while defense counsel were present in court. Id. at 13-17. Likewise, in 1907, our supreme court in Percer v. State, 103 S.W. 780, 781-83 (Tenn. 1907), reversed a conviction when the verdict was received in the defendant's absence. In doing so, our supreme court noted that the same principle applied "when the court charges the jury and when they are recharged or given additional instructions after retirement." Percer, 103 S.W. at 783 (citation omitted).

However, prior to 1967, neither Tennessee nor federal courts applied the harmless error doctrine to constitutional violations. See State v. Williams, 977 S.W.2d 101, 104 (Tenn. 1998); Sullivan v. Louisiana, 508 U.S. 275, 278 (1993); Arizona v. Fulminante, 499 U.S. 279, 306-07 (1991). Consequently, when a constitutional error occurred in a criminal trial, reversal was the automatic remedy. Id. In Chapman v. California, 386 U.S. 18 (1967), the United States Supreme Court rejected the proposition that all federal

-52-

constitutional errors that occur in the course of a criminal trial require reversal. Since Chapman, the Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." Id. Generally, in modern jurisprudence, application of the harmless error doctrine is the rule rather than the exception. See Williams, 977 S.W.2d at 105; see also Rose v. Clark, 478 U.S. 570, 579 (1986) (applying harmless error to the defendant's absence during unconstitutional burden-shifting jury instructions on element of malice). Indeed, both the United States Supreme Court and the courts of this State have applied the harmless error doctrine to a wide variety of constitutional errors. See Momon, 18 S.W.3d at 164-65 (citing an abundance of cases finding harmless error).

Although in 1998 our supreme court in Muse held that automatic reversal was required in that case, the court also noted other jurisdictions had concluded that a defendant's absence during only a small portion of the jury selection process was subject to harmless error analysis. See 967 S.W.2d. at 768 (citing United States v. Gordon, 829 F.2d 119, 127-28 (D.C. Cir. 1987)). We note that even prior to Muse, this court had held that any error regarding a defendant's being absent from jury selection for a short period of time was harmless. Curtis v. State, 909 S.W.2d 465, 469-70 (Tenn. Crim. App. 1995). And following Muse, in State v. Marlon D. Beauregard, No. W1999-01496-CCA-R3-CD, 2000 WL 705978, at *8 (Tenn. Crim. App. May 26, 2000), this court held that the defendant's absence during the initial roll call of potential jurors during jury selection did not amount to reversible error, deeming the error harmless. Likewise, in State v. Michael Lewis, W2002-0321-CCA-R3-CD, 2003 WL 1697689, at *6 (Tenn. Crim. App. Mar. 26, 2003), this court held that the trial court's conducting an ex parte proceeding at the conclusion of the first day of trial when neither the defendant nor his attorney were present did not result in prejudice to the defendant or the judicial process. In accord, the panel in State v. James Denver Case, No. M2014-00949-CCA-R3-CD, 2015 WL 7458507, at *13 (Tenn. Crim. App. Nov. 24, 2015), concluded that it was harmless error when the defendant was absent while the jury returned to the courtroom during deliberation to review video evidence and the trial court addressed the jury.

The Petitioner's alleged absences occurred only during the issuing of a supplemental instruction on criminal responsibility and when the trial court answered two questions from the jury; it was not for the entirety of the jury instructions. We conclude that the post-conviction court properly applied the harmless error doctrine.

The supplemental criminal responsibility instruction was a correct statement of the law. It was also clear that associate counsel was present when the supplemental instruction was read. When lead counsel returned, he raised an objection to the instruction, including asking for further closing argument. Furthermore, this court on

direct appeal concluded that issuance of the supplemental criminal responsibility instruction was proper and that the instruction's timing did not prejudice the Petitioner. Mathews, 2008 WL 2662450, at *18. This court reasoned that although the timing of the trial court's supplemental instruction "was not ideal," "the record establishe[d] that the jury had been deliberating only a short time when the trial court called the parties to the courtroom and indicated that it had 'inadvertently omitted' an instruction on criminal responsibility." Id. This court further observed that the trial court also "specifically informed the jury that the omission of the instruction in the earlier charge was unintentional and twice warned the jury not to place undue emphasis on the instruction." Id. Thus, even if the Petitioner was absent during the reading of the supplemental criminal responsibility instruction, his absence was harmless.

Regarding the trial court's answering the jury's questions, we note this court has likewise applied the harmless error doctrine to a trial court's communication with a jury via note, necessarily outside of that defendant's presence. See State v. Jeremy Sims and Sherry Brookshire, No. W2013-01253-CCA-R3-CD, 2015 WL 5683755, at *17-18 (Tenn. Crim. App. Sept. 25, 2015). In concluding that the error in that case was harmless, this court reasoned as follows:

> Trial courts should refrain from communicating with deliberating juries by passing notes. State v. Mays, 677 S.W.2d 476, 479 (Tenn. Crim. App. 1984). To prevent even the appearance of judicial partiality or unfairness, any proceedings involving the jury after it has retired for deliberations should be conducted in open court and in the defendant's presence. State v. Tune, 872 S.W.2d 922, 928 (Tenn. Crim. App. 1993); Smith v. State, 566 S.W.2d 553, 559-60 (Tenn. Crim. App. 1978). The proper method for fielding jury questions during deliberations is to recall the jury, counsel for both parties, the defendant, and the court reporter and to resolve the matter on the record. Mays, 677 S.W.2d at 479.

> The failure to follow the proper procedure, however, is subject to harmless error analysis. Tune, 872 S.W.2d at 928; Mays, 677 S.W.2d at 479. If the defendant has not been prejudiced by an inappropriate response, reversal is not required. Tune, 872 S.W.2d at 928.

Id.

Here, there was nothing inappropriate about the trial court's response to the jury's questions. The trial court's answer to the questions was simply that it could not provide further explanation because to do so would invade the province of the jury. In addition, the record reflects that counsel was permitted input before the response was provided.

Accordingly, any error associated with the Petitioner's purported absence from the courtroom during the court's answering the jury's questions was harmless.

We conclude that any failure to secure the Petitioner's presence on these two occasions did not prejudice the Petitioner. Consequently, trial counsel did not render ineffective assistance as to this issue.

V. Cumulative Effect

The Petitioner claims that the cumulative effects of the trial judge's and trial counsels' errors entitle him to relief. We would not agree with the Petitioner under a pure Strickland analysis. The cumulative error doctrine recognizes that in some cases there may be multiple errors committed during the trial proceedings, which, standing alone, constitute harmless error; however, considered in the aggregate, these errors undermined the fairness of the trial and require a reversal. State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). This court has also considered this doctrine in the context of ineffective assistance of counsel. See Gary Hawkins v. State, No. W2016-00723-CCA-R3-PC, 2017 WL 2829755, at *8 (Tenn. Crim. App. June 30, 2017). We have concluded that trial counsel were deficient in copious amounts post-trial and that the presumed prejudice of Cronic entitled the Petitioner to relief. In this case of further review, we note that if Cronic is found to be waived or inapplicable to the Petitioner's case, the Petitioner cannot establish prejudice under Strickland. He cannot show that he suffered prejudice from trial counsels' various deficiencies, when considered individually or together, because there is not a reasonable probability that but for this deficient performance, the Petitioner's motion for new trial would have been granted or he would have been granted relief on appeal. See, e.g., Larry Edward Moore, Jr. v. State, No. M2017-00903-CCA-R3-PC, 2018 WL 3238965, at *8 (Tenn. Crim. App. July 3, 2008), perm. app. denied (Tenn. Oct. 10, 2018) (determining that the petitioner did not suffer any prejudice from lead trial counsel's deficient performance because there was not a reasonable probability that, but for this deficient performance, the petitioner's motion for new trial would have been granted or he would have been granted relief on appeal). The evidence of the Petitioner's guilt was overwhelming. But for the application of Cronic, the Petitioner would not be entitled to relief via cumulative error.[19]

---

[19] The Petitioner attempts to present a claim that the trial court violated Blakely v. Washington, 542 U.S. 296 (2004), when it sentenced him to twenty-five years for the especially aggravated robbery conviction. He also seemingly claims ineffective assistance in this regard. We agree with the State that any Blakely violation issue is waived because it is raised for the first time on appeal. See Cauthern v. State, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004); see also Tenn. R. App. P. 36(a). Moreover, any freestanding Blakely claim would not garner relief in a post-conviction proceeding. See Laraiel Winton v. State, No. W2005-01421-CCA-R3-PC, 2012 WL 273759, at *7 n.2 (Tenn. Crim. App. Jan. 31, 2012) (citation omitted). Finally, the Petitioner does not dispute that neither the post-conviction record nor in the direct

-55-

CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is reversed. The case is remanded for the appointment of conflict-free counsel to represent the Petitioner in the motion for new trial phase. His convictions remain intact.

_____
D. KELLY THOMAS, JR., JUDGE

appeal record include a transcript of the sentencing hearing regarding this conviction. The Petitioner has failed to establish his factual allegations regarding his ineffective claim by clear and convicting evidence.